Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Brenda P. Funk, Esq.
Texas Bar No. 24012664
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-30246-mvl-7 |
| WITH PURPOSE, INC., | § | |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| TOBY NEUGEBAUER; BANZAI ADVISORY | § | Adv. No. 24-_____ |
| GROUP, LLC; BANZAI CAPITAL | § | |
| PARTNERS, LLC; NEUGEBAUER FAMILY | § | |
| ENTERPRISES, LLC; WPI COLLATERAL | § | |
| MANAGEMENT, LLC; and ONPOINT | § | |
| COMPANIES, LLC, | § | |
| | § | |
| Defendants. | § | |

### TRUSTEE'S ORIGINAL COMPLAINT

Scott M. Seidel (the "Trustee"), as the chapter 7 trustee of With Purpose, Inc. (the

"Debtor"), the debtor in the above-styled chapter 7 bankruptcy case (the "Bankruptcy Case"), files

this *Original Complaint* (this "Complaint") against the following (collectively, the "Defendants"):

Toby Neugebauer ("Neugebauer"), Banzai Advisory Group, LLC ("Banzai Advisory"), Banzai

Capital Partners, LLC ("Banzai Capital"), Neugebauer Family Enterprises, LLC ("NFE"), WPI Collateral Management, LLC ("WPI" or "Collateral Agent"), and OnPoint Companies, LLC ("OnPoint") in support of which he would respectfully show as follows:

## I.    **INTRODUCTION**

1.      Without leave of Court, certain of the Defendants filed lawsuits in Federal District Court in Delaware and Georgia asserting Estate causes of action against dozens of third parties,[1] seeking for themselves damages that are recoverable only by the Estate, and otherwise with the apparent intent of interfering with the Trustee's management of the Estate, including the imminent auction of Estate causes of action.  These asserted claims are almost entirely based on harm done to the Debtor by the tortious acts of third parties and seek remedies to which only the Estate is entitled.

2.      First, the Collateral Agent is grossly mistaken about its rights and standing to assert the claims in the new Georgia action.  There are myriad problems with the Collateral Agent's claims and liens.  The granting and perfection of the Collateral Agent's liens are each avoidable as insider preferences, since the vast majority of the Collateral Agent debt is held by the Debtor's insiders who only obtained and perfected liens weeks or months after funding and when the Debtor started circling the drain, in order to jump the line ahead of everyone else.  For the same reason, the majority of such obligations should be equitably subordinated, as Neugebauer breached his fiduciary duties when he caused the debt owed to himself and his affiliates to become secured while leaving other creditors high and dry, all while the Debtor was insolvent.

3.      Next, to the extent any portion of the Collateral Agent's liens are not avoidable or subject to subordination, the loan documents and foreclosure letter contain many "busts."  By way

---

[1] The defendants in the Georgia action, the "GA Defendants", the defendants in the Delaware action, the "DE Defendants", and collectively the "DEGA Defendants".

of example, the granting clause in favor of the Collateral Agent never attached to the Debtor's

trademarks.  Similarly, even if the liens attached, foreclosure was inappropriate because the Debtor

never actually defaulted on the underlying debt obligations as the Debtor never ceased operating

its business.  Moreover, on information and belief, the debt obligations were never accelerated –

that would have taken the vote of a supermajority of requisite noteholders, which did not occur.

Further, the foreclosure did not effect a foreclosure on the Debtor's trade secrets or confidential

information.  Because the Collateral Agent conducted a wrongful foreclosure, the Estate is entitled

to money damages, or alternatively a declaration that the Collateral Agent's deficiency claim is

eliminated under the UCC.  The Collateral Agent's wrongful actions also constitute a breach of

contract giving rise to damages.

4.      With respect to both the Georgia and Delaware actions, the common theme is that

the applicable Defendants seek damages for harms suffered by the Debtor.   The bad acts allegedly

committed by the Debtor's fiduciaries and third parties are commercial torts assertible only by the

Estate, and otherwise, breaches of contract which, even if they are collateral, still remain property

of the Estate today.  The Defendants try to circumvent this through clever pleading, but the lion's

share of the damages are derivative.

5.      The Defendants' failure to seek stay relief calls for permanent injunctive relief and

for severe sanctions.

## II.    <u>JURISDICTION & VENUE</u>

6.      On February 8, 2023 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code, thereby initiating the Bankruptcy Case and creating its bankruptcy estate (the "<u>Estate</u>").

7.      The Trustee is the duly appointed chapter 7 trustee of the Estate.

8.      The Court has jurisdiction over this Complaint under 28 U.S.C. § 1334.

9.      Such jurisdiction is core under 28 U.S.C. § 157(b)(2).   To the extent that any matter in this adversary proceeding is not core, the Trustee consents to this Court's entry of a final orders and judgment.

10.     Venue of this adversary proceeding before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

## III.    <u>PARTIES</u>

11.     The Trustee is the chapter 7 trustee of the Estate and files this Complaint in such capacity only.

12.     Defendant Neugebauer is a resident of the State of Texas.  Pursuant to Fed. R. Bankr. P. 7004(b), he may be served with process in this Adversary Proceeding anywhere that he may be found, including at his home as follows: Toby Neugebauer, 10777 Straight Lane, Dallas, Texas 75229.

13.     Defendant Banzai Advisory is a limited liability company organized and existing under the laws of the State of Texas.  Pursuant to Fed. R. Bankr. P. 7004(b), it may be served with process in this Adversary Proceeding by and through its registered agent as follows: Banzai Advisory Group, LLC, c/o Capitol Corporate Services, Inc., Registered Agent, 1501 S Mopac Expy, Suite 220, Austin, Texas 78701.

14.     Defendant Banzai Capital is a limited liability company organized and existing under the laws of the State of Texas.  Pursuant to Fed. R. Bankr. P. 7004(b), it may be served with process in this Adversary Proceeding by and through its registered agent as follows: Banzai Capital Partners, LLC, c/o Capitol Corporate Services, Inc., Registered Agent, 1501 S Mopac Expy, Suite 220, Austin, Texas 78701.

15.     Defendant NFE is a limited liability company organized and existing under the laws of the State of Texas.  Pursuant to Fed. R. Bankr. P. 7004(b), it may be served with process in this Adversary Proceeding by and through its registered agent as follows: Neugebauer Family Enterprise, LLC, c/o Capitol Corporate Services, Inc., Registered Agent, 1501 S Mopac Expy, Suite 220, Austin, Texas 78701.

16.     Defendant WPI is a limited liability company organized and existing under the laws of the State of Texas.  Pursuant to Fed. R. Bankr. P. 7004(b), it may be served with process in this Adversary Proceeding by and through its registered agent as follows: WPI Collateral Management, LLC, c/o J. Paul Manning, Registered Agent, 2112 Indiana Ave., Lubbock, Texas 79410.

17.     Defendant OnPoint is a limited liability company organized and existing under the laws of the State of Texas.  Pursuant to Fed. R. Bankr. P. 7004(b), it may be served with process in this Adversary Proceeding by and through its registered agent as follows: OnPoint Companies, LLC, c/o Todd Travers, Registered Agent, P.O. Box 801673, Dallas, Texas 75380, and by and through its manager, Reed Williams, as follows: OnPoint Companies, LLC, c/o Reed Williams, Manager, 3440 Potomac Avenue, Dallas, Texas 75205.

18.     Upon information and belief, Neugebauer is the manager of Banzai Advisory, Banzai Capital, and NFE.

## IV.    <u>BACKGROUND</u>

### A.    <u>THE DEBTOR</u>

19.    The Debtor, under the moniker GloriFi, aimed to provide a comprehensive package of financial products including credit cards, banking, insurance, mortgage, and brokerage services to 100 million Americans looking for such services from a company that shared their ideals and values.

20.    Management of the Debtor understood that the development of the technology, intellectual property, marketing, transaction execution and support, and regulatory compliance processes required in such a vast array of consumer-facing operations would require a not insubstantial amount of capital.

21.    To fund the start-up, the Debtor planned a series of three capital raises to generate approximately $100 million in cash a six (6) month period, the first of which (the Founders Round) was to close in September 2021.  The second and third capital raises were to consist of two (2) series of debt in the form of convertible notes issued by the Debtor and guaranteed by subsidiaries and other entities related to the Debtor.

22.    These initial funding rounds were designed to see the Debtor through initial product launches.  To cover capital needs after those initial launches, the Debtor intended to employ an alternative financing structure such as a merger with a special purpose acquisition company – a SPAC.

### B.    <u>THE FOUNDERS ROUND</u>

23.    The Founders Round offered 2.5 million shares of Class A Common Stock of the Debtor, which raised approximately $2.2 million.  Many of the DEGA Defendants participated in the Founders Round.  An additional $7.5 million was contributed by NFE for Class B common shares with superior voting power.  In connection with the Founders Round, all investors executed

(i) a Confidentiality and Proprietary Rights Agreement with the Debtor; and (ii) a Stockholders Agreement (which was subsequently amended) with the Debtor and the other Stockholders (together, the "Agreements").

## C.    THE SERIES 1 NOTE OFFERING

24.    Many of the DEGA Defendants were prepared to invest in the first series of convertible notes (the "Series 1 Notes"), set to close before the end of November 2021.  Absent such a closing, the Debtor would be unable to meet various financial and contractual obligations.

25.    During this period, discussions occurred between the Debtor and GA Defendant Vivek Ramaswamy ("Ramaswamy") regarding his future role in the company.  Ramaswamy declined the Debtor's offer to head up the Debtor's exchange traded funds (ETF) division.  Upon information and belief, the day thereafter, an assistant associated with GA Defendant Nick Ayers ("Ayers") completed a download of the Debtor's confidential information and trade secrets housed in a diligence platform.  On November 24, 2021, Ramaswamy and DEGA Defendant Cason Carter (an associate of GA Defendant Peter Thiel) demanded changes to the terms of the Series 1 Notes, including a veto right over certain future financings.  Disputes arose between Neugebauer, Ayers, Ramaswamy, and other investors regarding the propriety of, and intentions behind, this last-second demand.

26.    Ultimately, side letters were executed between the Debtor and each Series 1 noteholder with a face amount of Series 1 Notes above $500,000.  The side letters included controls over future financing, limitations on Neugebauer and NFE's voting powers, and protections for the Debtor's confidential information.

27.    At the conclusion of the Series 1 Notes offering, the Debtor had raised approximately $53 million.  Series 1 Notes were unsecured, thus no collateral was granted and no

financing statements were filed. Combined with the Founders Round capital raise, the Debtor had raised only $55.2 million of its $100 million goal.

**D.    POST-SERIES 1 NOTES OFFERING**

28.    Following the Series 1 Note Offering, Ayers and DEGA Defendant Keri Findley ("Findley") were appointed to the board of directors of the Debtor. Findley is affiliated with Thiel and Lonsdale.

29.    By February 2022, Ramaswamy was raising capital for an anti-woke investment concept – Strive – based on the Debtor's business strategy discussed with Neugebauer in November 2021. Ramaswamy even approached Neugebauer for an early investment in this copy-cat venture (and ultimately many DEGA Defendants or their affiliates did invest in Strive). In May 2022, after informally parting ways with the Debtor, Ramaswamy launched Strive – triggering accusatory emails from Neugebauer regarding the theft of the Debtor's information including trade secrets and business strategies. Neugebauer failed to take any action against Ramaswamy or Strive.

30.    On February 4, 2022, the Debtor executed a letter of intent with DHC Acquisition Corp (the "DHC LOI"), a SPAC, which would have provided some $1.573 billion in consideration for the benefit of the Debtor's Series 1 Noteholders and stockholders. The DHC LOI required that the Debtor have $40 million in cash on its balance sheet at closing (projected to occur at the end of March 2022).

**E.    THE (ACTUAL) SERIES 2 NOTES AND CONTEMPORANEOUS EVENTS**

31.    On February 15, 2022, shortly after committing to raise at least $40 million in cash for the DHC SPAC transaction, the Debtor proposed to the Series 1 Noteholders the outline of series 2: $75 million in convertible promissory notes at a $750 million valuation, treated *pari passu* with the Series 1 Notes.

32.     Ayers was tasked with raising the $75 million, including originating the same from the holders of Series 1 Notes and additional investors.  Throughout January, February, and early March 2022, Ayers represented no concerns with respect to series 2 fundraising.

33.     However, there was little activity in the Debtor's data room and Ayers did not undertake the same care as the Debtor took with respect to Series 1.

34.     On March 16, 2022, Ayers represented to the Debtor that the funds had not been raised – putting the DHC SPAC transaction at risk.  Certain of the DEGA Defendants indicated to the Debtor that Ayers never followed up on initial solicitations to acquire unsecured, convertible notes in the Debtor.

35.     At one point prior to the March deadline, Carter indicated to the CEO of Animo Bancorp that there was a group of around twenty (20) investors ready to invest upwards of $100,000,000 in the Debtor and its endeavors, but that such investment was contingent on a change of GloriFi's governance model.  By March 27, 2022, the wealthy investor groups associated with certain of the DEGA Defendants alerted the Debtor that they were waiting to invest in series 2 until certain due diligence, scheduled to occur in the first two weeks of April 2022, was completed.

36.     Funding by the end of March 2022 was critical in order for the Debtor to meet its financial and contractual obligations as well as the terms of the DHC LOI.

37.     That series 2 funds might arrive, if at all, after the end of March deadline calls into question the motives of potential investors (and signatories to side letters), as well as whether Ayers' actions with respect to fundraising were merely negligent or something more nefarious. The Estate has claims – that the Trustee anticipated selling at the upcoming auction – against these parties for breach of fiduciary duty and other torts for damages to the enterprise value suggested in the DHC LOI for the SPAC transaction.

38. During the last week of March and first week of April 2022, triggered by the imminent fundraising shortfall, a flurry of activity took place.

    i. Board members Ayers and Findley suggested removing Neugebauer as CEO, as did several of the wealthy investor groups;

    ii. Neugebauer proposed to fund $10 million at a $750 million valuation - Findley and Ayers voted against the proposal;

    iii. Neugebauer proposed to loan $30 million to the Debtor, with $10 million immediately available and another $20 million in the form of a line of credit, but in connection with an agreement whereunder Animo Bancorp (wholly owned by Neugebauer and his spouse) would purchase certain assets of the Debtor along with a revenue sharing agreement – Findley and Ayers asked for time to analyze and for legal review, while Neugebauer called a shareholder meeting where the employee equity owners, together with NFE, approved the arrangement;

    iv. At the same meeting, DHC announced a financing proposal of $40 million at a $750 million valuation, subject to several conditions including the removal of Neugebauer as CEO, the stacking of the board apparently in the favor of the wealthy investor groups, and otherwise limiting Neugebauer's power. It appears Ayers and/or Findley were connected to this proposal;

    v. First Findley, and then Ayers, were removed from the board, and Charlie Hamilton, John Norwood, and Alan Carr were appointed;

    vi. Neugebauer proposed a $10 million capital raise at a valuation of $250 million which was approved by the new board, which capital infusion had the alleged effect of converting the Series 1 Notes into equity; and

    vii. Ayers sent a letter to the board seeking an independent investigation of Neugebauer's actions, including as related to: (i) misrepresentations by Neugebauer that he would not stay on as CEO; (ii) the lack of fairness with respect to the proposed transfer of assets to Animo Bancorp; (iii) wrongfully removing Findley from the board; and (iv) multiple other issues going to breach of fiduciary duty.

39. As a result of the damage caused to the Debtor's business enterprise by the conduct described above, the Estate has colorable claims for breach of fiduciary duty, tortious interference with contract, misrepresentation and fraud, and other theories of recovery against Neugebauer, Ayers, Findley, various investors (including certain of the DEGA Defendants), and DHC.

40.     Locke Lord was hired to conduct the investigation, which lasted until June 24, 2022. The investigation delayed the Debtor's 2021 audit, the timely issuance of which was critical to the Debtor's consummation of the DHC SPAC transaction and other financial and contractual commitments. The investigation included a review of the propriety of Neugebauer's actions with respect to proposed insider transactions, as well the work environment at the Debtor and Neugebauer's behavior while CEO.

41.     On June 24, 2022, the Debtor initiated arbitration proceedings against Ayers and Stephen Curry claiming millions of dollars in damages to the Debtor for their bad acts based on legal theories substantially similar to the DEGA Complaints.

## F.     THE SERIES 2 NOTES AND THE COLLATERAL AGENT

42.     With Ayers and Findley out of the picture and the original series 2 financing round dead, the Debtor desperately needed cash to fund ongoing business development and operations and to salvage the DHC SPAC transaction. The Debtor, with the assistance of OnPoint Advisors, commenced an offering of secured, convertible series 2 notes (the "Notes"), styled *Secured Convertible Promissory Notes,* starting on or about May 13, 2022 and through November 10, 2022.

43.     Ultimately, some $23 million of the $36 million was raised from insiders of the Debtor, and a UCC-1 financing statement was filed with the Delaware Secretary of State on October 13, 2022 – three (3) days <u>after</u> the WSJ published its story, *How a New Anti-Woke Bank Stumbled: GloriFi CEO Toby Neugebauer won over A-list investors to build a bank for people who consider Wall Street too liberal. Within months it was nearly bankrupt.*

44.     A detailed review of the Notes and related agreements is warranted.

45.     There are important differences in the Notes with respect to the grant of security. Certain Notes with an issuance date prior to September 30, 2022 (the "Pre 9/30 Notes"), contained the following provision:

> 2.1 Secured. The obligations of the Company to Holder under this Note are secured pursuant to, and entitled to the benefits of, that certain Guarantee and Collateral Agreement, dated as of the date hereof, by and among the Company, OnPoint Companies, LLC, a Texas limited liability company, as Collateral Agent (herein, the "**Agent**"), and the other Grantors party thereto (the "**Guarantee and Collateral Agreement**" and, together with the Series 2 Notes (including this Note) and the Collateral Agency Agreement, and all other documents evidencing, securing, governing, guaranteeing and/or pertaining to this Note, collectively, the "**Note Documents**" and each, a "**Note Document**"), pursuant to which the Credit Parties (as defined below) have granted a security interest in certain Collateral (as defined therein).

46.     However, there was no such "Guarantee and Collateral Agreement, dated as of the date hereof, by and among the Company [and] OnPoint Companies, LLC". Rather, the only such document was the Collateral Agreement discussed below.  Furthermore, nowhere else in the Pre 9/30 Notes is there a grant of a security interest in any property of the Debtor.

47.     Other Pre 9/30 Notes contained different language.  By way of example, Note CN2-1 in the amount of $1,000,000 was purportedly issued to Charles Hamilton on May 13, 2022.  This Note provided that "[t]he obligations of the Company to Holder under this Note are secured pursuant to, and entitled to the benefits of, that certain Guarantee and Collateral Agreement, dated on or about *September 30, 2022*, by and among the Company, OnPoint Companies, LLC, a Texas limited liability company, as Collateral Agent (herein, the "**Agent**"), and the other Grantors party thereto . . .".  In other words, this Note referenced a non-existing and future instrument.

48.     The Pre 9/30 Notes failed to grant the holders thereof any security interest in any property of the Debtor, because they relied upon a non-existing (or unsigned) agreement and did not otherwise grant any such security interest.

49.     On or about September 30, 2022, the Debtor executed that certain *Guarantee and Collateral Agreement* with OnPoint, as the collateral agent, and various other grantor (and guarantor) parties (the "Collateral Agreement").

50.     On or about September 30, 2022, the Debtor and OnPoint executed that certain *Collateral Agency Agreement* (the "Agency Agreement"), together with the holders of the Notes (past, present, or future).

51.     Word B. Wilson Investments, LP allegedly holds an undated Note in the amount of $1,000,000.00.  Upon information and belief, this entity has not executed the Agency Agreement and, therefore, its debt and its rights are not subject to the Agency Agreement.

52.     The Collateral Agreement contains the following granting clause with respect to the Uniform Commercial Code:

Section 3. GRANT OF SECURITY INTEREST.

Each Grantor hereby assigns and transfers to the Collateral Agent, and hereby grants to the Collateral Agent, for its and its Affiliates', and the Holders' benefit, a continuing security interest in all of its Collateral, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Company Obligations or the Guarantor Obligations, as the case may be.

53.     Therefore, it was not until September 30, 2022, that the Pre 9/30 Notes were granted any collateral.

54.     Even then, the question remains: collateral for which obligations?  The Collateral Agreement provides that the security interests are granted "as collateral security for the prompt and complete payment and performance . . . of the Company Obligations."  "Company Obligations" is defined as "all Obligations (as defined in the Secured Notes) of the Company." (emphasis added).  But "Obligations" is not defined in the Notes.  The Notes elsewhere use the word "obligations" multiple times, but "Obligations" is never defined.

55.     Without taking into account the Alleged Foreclosure (defined below) or individual objections or recharacterization claims with respect to the Notes, the Debtor issued a total of $36,015,552.00 in Notes.

56.     Of this amount, $29,790,552.00 of the Notes were Pre 9/30 Notes, representing 82.7% of the Notes.

57.     Upon information and belief, as of September 30, 2022, the following were "insiders" of the Debtor as defined by section 101(31) of the Bankruptcy Code (collectively, the "Note Insiders"):

    i.    Charles Hamilton, board member and Round 1 investor;

    ii.    Banzai Capital Partners, LLC, as an affiliate and through a common insider, Neugebauer;

    iii.    Neugebauer Family Enterprises, LLC, as an affiliate and through a common insider, Neugebauer;

    iv.    Toby Neugebauer;

    v.    Melissa Neugebauer, as a relative of Neugebauer;

    vi.    Animo Bancorp, as an affiliate and through a common insider, Neugebauer[2]; and

    vii.    OnPoint GloriFi II, LP, because: (a) its general partner is OnPoint itself; (b) both it and OnPoint were managed and controlled by Todd Travers, with whom, upon information and belief, Neugebauer had transacted previous business deals; (c) a related party, OnPoint Advisors, acted as a promoter and *de facto* investment banker for the Debtor; (d) it was a Series 1 investor for $1,200,000.00; and (e) it was an insider of an insider, to the extent that OnPoint was itself an insider of the Debtor as alleged below.

---

[2] The Trustee does not concede that Animo Bancorp holds a Note for $5,840,552.00 (Note CN2-18), as Toby and Melissa Neugebauer have filed a claim for Note CN2-18 in their own names with a copy of the Note made out to them, and the Trustee is not aware of any assignment of said claim. *See* Claim Register Claim No. 53. The Trustee also does not concede that the Neugebauers hold such Note as the Collateral Agent's proof of claim lists Animo Bancorp has the holder of Note CN2-18. Moreover, the Trustee does not concede that either party is the holder of a validly issued Note as the Trustee has been unable to identify that the Note amount was ever funded.

58.     As of September 30, 2022, of the $29,790,552.00 in Notes then outstanding, $21,090,552.00 of this amount was held by the Note Insiders, representing 70.8% of the then-outstanding Notes.  If one removes from consideration the Note of Word B. Wilson Investments, LP for $1,000,000.00, this percentage increases to 73.2%.

59.     As to attachment of liens, the first time that the Note Insiders received any security or collateral for their Notes was September 30, 2022, at a time when they were insiders of the Debtor.

60.     As of September 30, 2022, OnPoint was the attorney-in-fact for the Debtor, having been so appointed pursuant to section 7.1 of the Collateral Agreement:

> Each Grantor hereby irrevocably constitutes and appoints the Collateral Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact and proxy with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, each Grantor hereby gives the Collateral Agent the power and right, on behalf of and at the expense of such Grantor, without notice to or assent by such Grantor, to do any or all of the following . . .

61.     Next, the Collateral Agreement itemizes an exhaustive list of specific powers, which include the power to cause the Debtor to transfer its property (sections 6.6 and 6.7 of the Collateral Agreement).

62.     The Trustee therefore asserts that, as of September 30, 2022, OnPoint was a non-statutory insider of the Debtor for purposes of the transactions described herein (the granting of security interests and the Alleged Foreclosure): (i) OnPoint was the attorney-in-fact for the Debtor,[3] *see, e.g., In re Vista Bella Inc.*, 511 B.R. 163, 207 (Bankr. S.D. Ala. 2014); (ii) OnPoint

---

[3] An "attorney in fact," at least as applied to a particular transaction or subject, is a person authorized by another to act in his place and stead.  It is difficult to conceive of a person who is more of an "insider" of the Debtor with respect

had the irrevocable power to transfer the Debtor's assets even without the authority of the Debtor or its management; (iii) OnPoint had access to timely and periodic confidential and proprietary financial and business information of the Debtor; and (iv) OnPoint was the agent for 73.2% of the holders of the Notes, themselves insiders.

63.     In the Agency Agreement, the holders of the Notes generally appoint the Collateral Agent as their agent, but only to the extent provided therein and not as a general agent with general powers.  Among other things, section 2.1(c) of the Agency Agreement provides that each holder of the Notes:

> irrevocably appoints and authorizes the Collateral Agent to act as the agent of (and to hold any security interest created by the Note Documents for and on behalf of or on trust for) such Holder for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by the Grantors to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.

64.     Importantly, no provision of the Agency Agreement grants the Collateral Agent any authority to declare an Event of Default or to accelerate the Notes.  Nor is the acceleration of a Note a "power" or "discretion" that is "reasonably incidental" to the "acquiring, holding and enforcing any and all Liens on Collateral."  Rather, section 6.2 of the Agency Agreement expressly provides that "[n]othing in this Agreement shall . . . affect or impair the right any Holder may have under the Note Documents to accelerate the Obligations."

65.     Likewise, section 16.20 of the Notes provides that the Collateral Agent "is authorized and empowered, on behalf of Holder and the holders of the other Series 2 Notes to, upon the occurrence and during the continuation of an Event of Default, exercise rights and remedies with respect to the Collateral pledged to secure the obligations of the Company under the Series 2 Notes pursuant to the Guarantee and Collateral Agreement."

---

to the transactions the subject of this Complaint than one who is authorized by law to act in the Debtor's place and in its stead

66.     Therefore, only upon a proper "Event of Default" is the Collateral Agent authorized to act (and then only to the extent so authorized).  But the Collateral Agent is not itself authorized to declare an "Event of Default."

67.     Section 2.1(e) of the Agency Agreement provides that:

Neither the Collateral Agent nor any Holder shall take any action described in clause (b), (c) or (e) of the definition of 'Enforcement' without the written consent of the Required Noteholders.  As to matters otherwise requiring the exercise of discretion or of a right, including the right to give any consent or make any demand under any Note Document or to determine under any Note Document whether any matter is acceptable or satisfactory to it, or as to matters not expressly provided for by the Note Documents, the Collateral Agent will not be required to exercise any discretion or right or take any action, but will be required to act or to refrain from acting (and will be fully protected in so acting or refraining from acting) and will only be required to act upon the written instructions of the Required Noteholders.

68.     The Agency Agreement defines "Enforcement" as:

(a) a declaration that the Notes are immediately due and payable in accordance with Section 15.2 of the Series 2 Notes; (b) a Holder makes demand for payment of or accelerates the time for payment prior to the scheduled payment date of its Note in accordance with Section 15.2 of the Series 2 Notes; (c) the Required Noteholders make a demand for payment or accelerate the time for payment prior to the scheduled payment date of the Notes in accordance with Section 15.2 of the Series 2 Notes . . . (e) the Collateral Agent commences the enforcement of any rights or remedies under the Series 2 Notes (other than an action solely for the purpose of establishing or defending the lien or security interest intended to be created by the Guarantee and Collateral Agreement upon or in any Collateral as against or from claims of third parties on or in the Collateral), to (i) setoff, freeze or otherwise appropriate any balances held by it for the account of the Grantors, or any other property at any time held by it for the credit or for the account of any of the Grantors, or (ii) otherwise take any action to realize upon the Collateral.

69.     The Agency Agreement does not define "Required Noteholders."  Given that this term is capitalized, the parties to the Agency Agreement intended for it to have a certain meaning that they knew.  More than likely, "Required Noteholders" is a simple mistake and was intended to be "Requisite Noteholders," which is a defined term in the Notes (as discussed below).

70.     Each of the Notes contained identical definitions of "Event of Default" as follows (with "Company" being defined as the Debtor):

(i) The Company fails to pay when due and payable (whether at maturity or otherwise) the full amount of principal or interest on this Note (or any other Series 2 Note) when due, and such failure to pay is not cured within ten (10) days after the occurrence thereof; or

(ii) the occurrence of any event of default specified in any of the other Note Documents; or

(iii) The Company is dissolved, terminated, or ceases to operate its business; or

(iv) The Company makes an assignment for the benefit of creditors or admits in writing its inability to pay its debts generally as they become due; or an order, judgment or decree is entered adjudicating the Company bankrupt or insolvent; or any order for relief with respect to the Company is entered under the Federal Bankruptcy Code; or the Company petitions or applies to any tribunal for the appointment of a custodian, trustee, receiver or liquidator of the Company, or of any substantial part of the assets of the Company, or commences any proceeding relating to the Company under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction; or any such petition or application is filed, or any such proceeding is commenced, against the Company and either (A) the Company by any act indicates its approval thereof, consent thereto or acquiescence therein or (B) such petition, application or proceeding is not dismissed within sixty (60) days; or

(v) The Company fails to comply with Section 17 of this Note.

71.     The Collateral Agent has alleged that an "Event of Default" had occurred because the Debtor had "ceased to operate its business."  This phrase is not defined.  However, at no time prior to the Petition Date did the Debtor "cease to operate its business."  Among other things: (i) the Debtor had management in place; (ii) upon information and belief, the Debtor continued to have employees; and (iii) as late as January 5, 2023, the Debtor's independent director was pursuing sales of the Debtor's technology.

72.     Under section 7.1(a) of the Collateral Agreement, the Collateral Agent is permitted to exercise its authority as the Debtor's attorney-in-fact only if an "Event of Default" "shall have occurred and be continuing."

73.     Each of the Notes contains an identical remedies provision upon an "Event of Default" as follows:

15.1 <u>Generally</u>. If any Event of Default has occurred, the Holder of this Note may declare all amounts due under the Note (including without limitation all accrued but unpaid interest thereon and all other amounts due in connection therewith) due and payable and demand immediate payment thereof without further notice or demand.

15.2 <u>Rights and Remedies</u>. Upon approval of the Requisite Noteholders, the Holder of this Note shall also have and may exercise, and may direct (or the Requisite Noteholders may direct) Agent to exercise, any and all other rights or remedies which such Holder may have under any Note Document or contract or agreement at any time and any other rights or remedies which such Holder or Agent may have pursuant to applicable law.

15.3 <u>Waiver</u>. The Company hereby waives diligence, presentment, protest and demand and notice of protest and demand, dishonor and nonpayment of this Note, and expressly agrees that this Note, or any payment hereunder, may be extended from time to time and that the Agent hereof may accept security for this Note or release security for this Note, all without in any way affecting the liability of the Company hereunder.

74.    Thus, while each holder of the Note may accelerate the Note upon an "Event of Default," any foreclosure of any security requires the approval of the "Requisite Noteholders." "Requisite Noteholders," in turn, is defined in the Notes as "the written consent of holders of at least 81% of the aggregate outstanding principal amount of the Series 2 Notes."

75.    The Notes do not contain an automatic acceleration clause upon an "Event of Default." Rather, as pointed out above, each holder of the Notes "may" accelerate the Note. This is further confirmed by section 16.19 of each Note, which provides that "[i]f the maturity of this Note is accelerated by reason of an election by the Holder hereof resulting from an Event of Default . . .".

76.    Nowhere in the Notes do the holders thereof grant the Collateral Agent the authority to accelerate the Notes on their behalf.

77.    Nowhere in the Collateral Agreement is the Collateral Agent granted the right to accelerate the Notes.

78.     Nowhere in the Agency Agreement is the Collateral Agent granted the right to accelerate the Notes without the "Required Noteholders" so instructing it.  Accordingly, it cannot be claimed that the Notes were due and that failure to pay was an Event of Default.

G.     **THE ALLEGED FORECLOSURE**

79.     On January 5, 2023, the Collateral Agent sent to the Debtor that certain *Notice of Default Under Secured Convertible Promissory Notes* (the "Foreclosure Notice"), alleging a default under the Notes and purporting to act as the Debtor's attorney-in-fact to transfer the "Software" and the "Software Assets" to the Collateral Agent as a foreclosure against the same under the Uniform Commercial Code.  A true and correct copy of the Foreclosure Notice is attached hereto as Exhibit A.

80.     The Foreclosure Notice defines "Software" and "Software Assets" as "the software that was being developed by or on behalf of the Company for its business (the "Software"), including but not limited to source code, object code, scripts, programming tools, diagrams, documentation, presentations, correspondence and notes relating to the Software, any hardware used in connection with the Software, as well as any other tangible or intangible asset of the Company or its agents related to the Software, wherever located (the "Software Assets")."

81.     The Foreclosure Notice further purported to define the Collateral Agent's collateral as including "any intellectual property rights associated with the Software, including but not limited to the Intellectual Property . . . trade secrets, shop rights, work made for hire."  However, this was not included within the above definitions of Software and Software Assets.

82.     Furthermore, the Foreclosure Notice only (and allegedly) transferred the Software and the Software Assets: "[p]ursuant to Section 9.609 of the Texas Business and Commerce Code [ ] the Collateral Agent as a secured party intends to take possession of the Collateral consisting

of the Software and Software Assets as described above," and "under section 9.620 of the Code, the Collateral Agent will accept exclusive ownership of the Software and Software Assets . . .".

83.    The Collateral Agent purported to foreclose on the Software and Software Assets in January, 2023 (the "Alleged Foreclosure").

84.    At the time of the Alleged Foreclosure, the Debtor had not granted a security interest in its property to the Collateral Agent to secure the Notes because the Notes fail to define "Obligations," as required by the Collateral Agreement's granting clause.

85.    At the time of the Alleged Foreclosure, however, and even if there was a valid grant of security interests, the Debtor had not defaulted under the Notes.  Among other things, the Notes were not due (as they had not been accelerated), the Debtor was not dissolved, the Debtor was not terminated, the Debtor did not file bankruptcy or give an assignment for the benefit of creditors, and the Debtor did not cease to operate its business.

86.    At the time of the Alleged Foreclosure, and even if there was a valid grant of security interests and an "Event of Default," the Notes were not automatically accelerated, the holders of the Notes had not accelerated the Notes, and the Collateral Agent had no authority or agency to accelerate the same on their behalf.

87.    At the time of the Alleged Foreclosure, and even if these was a valid grant of security interests, an "Event of Default," and acceleration, upon information and belief the "Requisite Noteholders" and the "Required Noteholders" in the Agency Agreement had not authorized the Collateral Agent to take such action in writing as required.

88.    Indeed, nowhere in the Foreclosure Notice does the Collateral Agent even purport to represent that the holders of the Notes accelerated the Notes, or that it has the authority to accelerate the same and that it had in fact accelerated the same, or that the Requisite Noteholders had authorized the Alleged Foreclosure.

89.     Therefore, the Collateral Agent had no lawful right to effectuate the Alleged Foreclosure pursuant to the terms of the agreements themselves as well as the UCC.

90.     Appended to the Foreclosure Notice was a *Consent of Board of Directors*, drafted and prepared by the Collateral Agent.  This document was signed by Hunter Bywaters on January 6, 2023, as an alleged independent director of the Debtor (the "Bywaters Consent").

91.     To the extent that the Collateral Agent argues that the Bywaters Consent constitutes waiver, ratification, estoppel, consent, or a legally binding document in any way, the Trustee responds that any such argument is the affirmative defense of the Collateral Agent and that the Bywaters Consent is ineffective and void: (i) as executed without proper corporate authority, making it *ultra vires*; (ii) Bywaters was not properly appointed as a director of the Debtor; (iii) a director as such does not speak for the Debtor and does not, individually, bind the Debtor; and (iv) the Debtor received no return consideration for the Bywaters Consent, thus rendering it void for lack of consideration.  Furthermore, OnPoint prepared the Bywaters Consent, going so far as to include a signature for Bywaters as an "Independent Director."

92.     Finally, the Collateral Agreement does not grant a lien on all of the Debtor's intellectual property.  It purportedly granted liens on "Intellectual Property," which is defined as,

> the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, ***including*** the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks and the Trademark Licenses, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

93.     Separately, Schedule 5 to the Collateral Agreement lists "***all*** the Intellectual Property owned" as of the date of execution.  The scope of the Debtor's intellectual property subject to the Collateral Agreement is confined by the Collateral Agreement's definition of

"Intellectual Property" and Schedule 5.  According to Schedule 5, the Debtor had no Copyrights,

Copyright Licenses, Patents, Patent Licenses, or Trademark Licenses.  Schedule 5 lists twenty-one

(21) Trademarks; however, all such Trademarks fall into the Excluded Assets[4] under the Collateral

Agreement on which no lien is granted.

## H.    THE BANKRUPTCY CASE

94.    On the Petition Date, the Debtor filed the Bankruptcy Case.

95.    Administration of the Estate by the Trustee has involved the review of a document

repository containing in excess of one million documents; conferences and meetings with certain

relevant third-parties; and research, fact development and assessment of potential claims, causes

of action, and assets belonging to the Debtor in a failed enterprise involving dozens of sophisticated

investors.

96.    After months of review, numerous consultations with interested parties, the Trustee

filed his *Amended Motion for Entry of (I) An Order (A) Approving Bid and Noticing Procedures,*

*(B) Scheduling an Auction and Hearing, and (C) Granting Related Relief; and (II) An Order (A)*

*Approving Sale of Debtor Assets Free and Clear of All Liens, Claims, Encumbrances, and*

*Interests, and (B) Granting Related Relief* (the "Bid Procedures Motion") [Docket No. 186] on

April 10, 2024.  A hearing on the Bid Procedures Motion was set for May 7, 2024 (the "Bid

Procedures Hearing").

97.    Just days prior to the Bid Procedures Hearing, the new Collateral Agent, WPI

Collateral Management, LLC, filed its Notice of Appearance in the Bankruptcy Case, apparently

replacing OnPoint.  The Trustee, Neugebauer, the Collateral Agent, Ayers, and Jackson Investment

---

[4] The definition of Excluded Assets includes, inter alia:  any applications for trademarks or service marks filed in the United States Patent and Trademark Office or any successor thereto (the "PTO") on the basis of the applicant's intent-to-use such trademark or service mark, prior to the filing of an amendment with the PTO under 15 U.S.C. §1051(c) that brings the application into conformity with 15 U.S.C. §1051(a) or the filing of a verified statement of use with the PTO under 15 U.S.C. §1051

Group all worked towards an agreed bid procedures order and, on May 17, 2024, the Court entered

the *Order (A) Approving Bid and Noticing Procedures and (B) Scheduling an Auction and*

*Hearing, and (C) Granting Related Relief* (the "Bid Procedures Order") [Docket No. 197].  The

Bid Procedures Order established the date by which bids for claims needed to be submitted, the

date of the auction, and setting the hearing to approve the proposed sale.  Each of these dates was

agreed upon by counsel for the Trustee, Neugebauer, Ayers, Jackson Investment Group, and the

Collateral Agent.

98.    The very same day, the Trustee received notice from counsel for Ayers that

Neugebauer and the Collateral Agent had filed the GA Complaint. The DE Complaint was filed

shortly thereafter.

### D.    THE DELAWARE AND GEORGIA COMPLAINTS

99.    On May 17, 2024, Neugebauer, Banzai Capital, Banzai Advisory, and NFE

(collectively, the "Delaware Plaintiffs") filed the DE Complaint in the United States District Court

for the District of Delaware (the "Delaware Court"), a true and correct copy of which is attached

hereto as Exhibit B and incorporated herein, thereby initiating Civil Proceeding 1:24-cv-00599

pending before that court (the "Delaware Proceeding").

100.    On May 17, 2024, the Collateral Agent, Banzai Advisory, Banzai Capital, NFE,

and Neugebauer (collectively, the "Georgia Plaintiffs") filed the GA Complaint in the United

States District Court for the District of Delaware (the "Georgia Court"), a true and correct copy of

which is attached hereto as Exhibit C and incorporated herein, thereby initiating Civil Proceeding

1:24-cv-02148 pending before that court (the "Georgia Proceeding")

101.    The DEGA Complaints state that "Plaintiffs do not seek any lost equity value in GloriFi or any other damages property of the GloriFi Bankruptcy Estate."[5] This, however, is either intentionally false or wrong as a matter of law, because the underlying claims and resulting damages asserted in the DEGA Complaints belong to the Debtor and, therefore, to the Estate, as explained below.

## V.    CAUSES OF ACTION

**COUNT 1:    DECLARATORY JUDGMENT REGARDING EXTENT OF ALLEGED FORECLOSURE (WPI)**

102.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

103.    Assuming that the Alleged Foreclosure was valid and effective, which point the Trustee does not concede, an actual and present controversy exists between the Trustee and WPI regarding what assets of the Debtor were transferred to OnPoint, the Collateral Agent at the time, at the Alleged Foreclosure.

104.    At the Alleged Foreclosure, and assuming the validity thereof, the sole assets of the Debtor transferred to OnPoint were the "Software" and the "Software Assets." These categories of assets are specifically and strictly defined in the Foreclosure Notice. Among other things, "Software" and "Software Assets" does not include the following, regardless of whether the following is otherwise the collateral of the holders of the Notes: Intellectual Property, trade secrets, General Intangibles, causes of action, rights against third parties, or any of the claims and causes of action asserted by the Collateral Agent in the GA Complaint.

105.    The Collateral Agent, however, has taken the position that it foreclosed on all of the Debtor's "Intellectual Property," *see* GA Complaint at ¶ 49, which it did not.

---

[5] DE Compl. p. 1 n.1, para. 212 n.32; GA Compl. para. 273, n.32, para 288 n.35.

106.    Accordingly, the Trustee seeks judgment that, to the extent that the Alleged Foreclosure was valid—and only to that extent, subject to all of the Trustee's arguments otherwise: (i) the sole property of the Debtor transferred to the Collateral Agent was the software that was being developed by or on behalf of the Debtor for its business, including but not limited to source code, object code, scripts, programming tools, diagrams, documentation, presentations, correspondence and notes relating to the Software, any hardware used in connection with the Software, as well as any other tangible or intangible asset of the Company or its agents related to the Software, wherever located; and (ii) the Collateral Agent did not foreclose on, receive, or acquire any of the Debtor's Intellectual Property, General Intangibles, trade secrets, causes of action, rights against third parties, or any of the claims and causes of action asserted by the Collateral Agent in the GA Complaint.

**COUNT 2:    DECLARATORY JUDGMENT REGARDING VALIDITY OF ALLEGED FORECLOSURE (ONPOINT AND WPI)**

107.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

108.    Assuming that the appointment of the Collateral Agent as the Debtor's attorney-in-fact in the Collateral Agreement was valid and enforceable, which point the Trustee does not concede, an actual and present controversy exists regarding whether the Alleged Foreclosure was valid in order to transfer any property of the Debtor to the Collateral Agent.

109.    The Collateral Agreement provides that the Collateral Agent will not exercise any power it has absent an "Event of Default."  The Collateral Agreement and the UCC do not permit the Collateral Agent to foreclose on any collateral without an "Event of Default."  The Notes, Collateral Agreement, and Agency Agreement do not permit the Collateral Agent to accelerate the Notes.  The Notes, Collateral Agreement, and Agency Agreement do not permit the Collateral

Agent to foreclose on any collateral without the "Requisite Majority" of Noteholders so instructing or approving.  And, even if the Collateral Agent was permitted to transfer or foreclose on *anything*, there was no outstanding obligation of the Debtor to do so for because the Notes had not been accelerated.

110.    Here, at the time of the Foreclosure Notice and at the time of the Alleged Foreclosure: (i) there was no Event of Default by the Debtor under the Notes or within the meaning of section 9.609(a) of the U.C.C.; (ii) there was no acceleration of the Notes; (iii) no funds or sums were then due and owing under the Notes; and (iv) upon information and belief, the Requisite Majority of the Noteholders had not approved of, or instructed, the Collateral Agent to foreclose against any property of the Debtor.

111.    Therefore, the Collateral Agent had no right under any of the Notes, Collateral Agreement, Agency Agreement, or UCC to foreclose against any property of the Debtor at the Alleged Foreclosure or to cause the Debtor to transfer any of its property to the Collateral Agent as part of the same.

112.    The Bywaters Consent, to the extent that it has any validity, and without changing any reliance thereon to anything other than an affirmative defense, does not change this conclusion. Among other things, all that the Bywaters Consent does is to "consent" to what the Collateral Agent was doing; it neither effectuated anything for the Collateral Agent, gave the Collateral Agent any greater rights or powers than it already had, or amended or modified any agreement.  That one may consent to someone's action is not the same as one being otherwise legally authorized to undertake such action, the same as one may not consent to being shot at for target practice.

113.    Accordingly, the Trustee requests judgment that the Alleged Foreclosure was invalid and ineffective under the underlying agreements and the UCC and, therefore, transferred none of the Debtor's property to the Collateral Agent.

**COUNT 3:**    **PERMANENT INJUNCTION AGAINST COLLATERAL AGENT (WPI)**

114.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

115.    It goes without saying that one is entitled to legal assistance by way of injunction to prohibit and prevent another from exercising control over his property or representing to third parties that he owns property that he does not.

116.    Accordingly, to the extent that the Court grants the Trustee relief on Counts 1 and 2 of this Complaint, the Trustee requests that the Court issue an injunction prohibiting the Collateral Agent, any successor thereof, and any holder of any Note, from making any statement, or taking any action indicative, of ownership or control of, or dominion over, any property of the Estate that is the subject of the Court's grant of relief to the Trustee.

**COUNT 4:**    **WRONGFUL FORECLOSURE UNDER THE UCC (ONPOINT AND WPI)**

117.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

118.    In effectuating the Alleged Foreclosure, and in addition to not complying with the underlying agreements, OnPoint violated section 9.609(a) of the U.C.C. because there was no "Event of Default" by the Debtor such as would give OnPoint any right under the U.C.C. to enforce its remedies.  As such, the Alleged Foreclosure failed to comply with Chapter 9 of the U.C.C. within the meaning of section 9.625(b) of the U.C.C.

119.    The Debtor was damaged by the wrongful Alleged Foreclosure by way of loss of its Software and its Software Assets, which prevented the Debtor and subsequently the Estate from completing its intended business or selling that business as a unified package.  In other words, the wrongful Alleged Foreclosure means that the Trustee was unable to sell the Debtor or its assets to

a willing buyer because of the Collateral Agent's claim of ownership of key components of the Debtor's business and its intended product.

120.    Accordingly, the Trustee seeks a money judgment against the Collateral Agents, jointly and severally, under section 9.625(b) of the U.C.C., in an amount to be proven at the trial of this Adversary Proceeding.

121.    Alternatively, and in preference to a money judgment under section 9.625(b), the Trustee seeks a declaration that any deficiency claim of the Collateral Agent or the Noteholders after the Alleged Foreclosure be eliminated pursuant to section 9.626(a)(3)(B) of the U.C.C. on account of the Collateral Agent's wrongful Alleged Foreclosure.

**COUNT 5:    BREACH OF CONTRACT (ONPOINT AND WPI)**

122.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

123.    The Collateral Agreement is a written agreement between the Debtor and the Collateral Agent.

124.    In the Collateral Agreement, the Debtor gave the Collateral Agent a power of attorney (as attorney-in-fact) to transfer certain property of the Debtor.  However, as specified in section 7.1(a) of the Collateral Agreement, "the Collateral Agent agrees that it will not exercise any rights under the power of attorney or the irrevocable proxy provided for in this Section 7.1(a) unless an Event of Default shall have occurred and be continuing."

125.    The Collateral Agent breached this agreement when it transmitted the Foreclosure Notice and when it effectuated the Alleged Foreclosure by using its power of attorney to transfer the Debtor's property to itself.  This is because, among other things, there was no "Event of Default" then pending.  This is also because the Collateral Agent had not been authorized or

instructed by the Requisite Noteholders to so act, and also because the Debtor's obligations under
the Notes had not been accelerated.

126.    The Debtor was damaged by the foregoing breach of contract.  Among other things,
either the Debtor's Software and Software Assets were wrongly taken away from it, or the
Collateral Agent's assertions that it now owned the Software and the Software Assets made it
impossible for the Debtor to continue in business and then for the Debtor and the Trustee to sell
the Debtor as a potential going concern, or to otherwise monetize the Debtor's business assets,
because its Software and Software Assets were integral to that business and no reasonable buyer
would buy the Debtor's or Estate's business assets without those assets.

127.    Accordingly, the Trustee seeks a money judgment against OnPoint and WPI, jointly
and severally, for the Debtor's damages resulting from said breach of contract in an amount to be
proven at trial.  The Trustee further seeks his reasonable attorney's fees and expenses pursuant to
the Collateral Agreement and Texas law.

**COUNT 6:**    **AVOIDANCE OF COLLATERAL AGREEMENT'S GRANT OF SECURITY AS INSIDER
PREFERENCE (WPI)**

128.    The Trustee hereby incorporates all factual allegations set forth above and below,
throughout this Complaint, as though fully stated here.

129.    As of September 30, 2022, none of the Pre 9/30 Notes were secured, in that none
of them was subject to the granting of a security interest under the UCC.

130.    The execution of the Collateral Agreement constituted a transfer by the Debtor of
an interest in its property, namely security interests in its property to the extent specified in the
Collateral Agreement.

131.    The Debtor was insolvent on September 30, 2022.  Among other things, the Debtor
owed approximately $30 million to on the Notes, millions more in unpaid trade debt and other

obligations, and the value of the Debtor's assets had by that time become worth less than \$30 million because the Debtor was not able to get its funding and its capital raises off the ground.[6]

132.    The granting of security interests in the Collateral Agreement was a transfer to or for the benefit of creditors, namely the holders of the Pre 9/30 Notes.

133.    The granting of security interests in the Collateral Agreement was a transfer on account of antecedent debt of the Debtor, namely to securitize the Pre 9/30 Notes.

134.    The granting of security interests in the Collateral Agreement enabled the holders of the Pre 9/30 Notes to recover more than had such grant not been made, had the Debtor then filed a Chapter 7 case, and had such holders been paid in such case pursuant to the provisions of the Bankruptcy Code, because, in such a case, said holders would have been treated as unsecured creditors and not secured creditors.

135.    The Trustee asserts that OnPoint was an insider of the Debtor at the time of the Collateral Agreement and, therefore, that the grant of security interests in the Collateral Agreement was an insider preference as to each holder of a Pre 9/30 Note.

136.    Alternatively, the Trustee asserts that each of the Note Insiders was an insider of the Debtor at the time of the Collateral Agreement and, therefore, that the grant of security interests in the Collateral Agreement was an insider preference as to each of the Note Insiders.

137.    The granting of security interests in the Collateral Agreement was within one (1) year of the Petition Date.

138.    Accordingly, the Trustee seeks a judgment avoiding any granting of security interests in the Collateral  Agreement as to each Pre 9/30 Note or, alternatively, as to each of the

---

[6] Indeed, if the allegations of WPI in the GA Complaint are true, then it cannot disagree with the Debtor's insolvency on that date.

Note Insiders (but only with respect to a Pre 9/30 Note) or so many of them as the Court concludes were insiders on September 30, 2022, under section 547(b) of the Bankruptcy Code.

**COUNT 7:**    **AVOIDANCE OF COLLATERAL AGREEMENT'S PERFECTION OF SECURITY AS INSIDER PREFERENCE (WPI)**

139.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

140.    The Collateral Agent perfected its security interests on October 13, 2022.

141.    Said perfection constituted a transfer of property of the Debtor within the meaning of the Bankruptcy Code.

142.    Said perfection was a transfer to or for the benefit of creditors, namely the holders of the Pre 9/30 Notes.

143.    Said perfection was a transfer on account of antecedent debt of the Debtor, namely to prioritize the Pre 9/30 Notes.

144.    Said perfection enabled the holders of the Pre 9/30 Notes to recover more than had such transfer not been made, had the Debtor then filed a Chapter 7 case, and had such holders been paid in such case pursuant to the provisions of the Bankruptcy Code, because, in such a case, a trustee would have avoided unperfected security interests pursuant to his "strong arm" powers under section 544 of the Bankruptcy Code.

145.    The Trustee asserts that OnPoint was an insider of the Debtor at the time of said perfection and, therefore, that said perfection was an insider preference as to each holder of a Pre 9/30 Note.

146.    Alternatively, the Trustee asserts that each of the Note Insiders was an insider of the Debtor at the time of said perfection and, therefore, that said perfection was an insider preference as to each of the Note Insiders.

147.    Said perfection was within one (1) year of the Petition Date.

148.    Accordingly, the Trustee seeks a judgment avoiding the Collateral Agent's filed U.C.C. financing statement as to each Pre 9/30 Note or, alternatively, as to each of the Note Insiders (but only with respect to a Pre 9/30 Note) or so many of them as the Court concludes were insiders on September 30, 2022, under section 547(b) of the Bankruptcy Code.

**COUNT 8:    AVOIDANCE OF COLLATERAL AGREEMENT'S UNPERFECTED SECURITY INTERESTS (WPI)**

149.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

150.    The Trustee asserts this Count 8 in the alternative to Count 6 of this Complaint; namely, if the Court does not avoid the grant of a security interest in the Collateral Agreement regarding the Pre 9/30 Notes, but avoids the perfection thereof, the Trustee requests the avoidance of such unperfected security interests under section 544(a) of the Bankruptcy Code pursuant to his "strong arm" powers.

**COUNT 9:    RECOVERY OF AVOIDED TRANSFERS**

151.     The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

152.    Pursuant to section 550 of the Bankruptcy Code, the Trustee requests the recovery, for the benefit of the Estate, of all liens and security interests avoided under this Complaint and of all other transferred assets or their value, in amounts to be determined at trial.

**COUNT 10:    DECLARATORY JUDGMENT REGARDING GRANTING CLAUSE**

153.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

154.    The Debtor's Trademarks constituted Excluded Assets under the Collateral Agreement.

155.    Therefore, the Trustee seeks a declaration that the Collateral Agreement did not attach to the Debtor's Trademarks.

**COUNT 11:**  **EQUITABLE SUBORDINATION (NEUGEBAUER AND COLLATERAL AGENT)**

156.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

157.    Pursuant to section 510(c)(1) of the Bankruptcy Code, the Trustee seeks equitable subordination of the Notes held by the Note Insiders.

158.    The execution of the Collateral Agreement on September 30, 2022 occurred weeks and months after much of the funds from the Note Insiders had been advanced.  At all relevant times, Neugebauer owed the Debtor a fiduciary duty of loyalty.  As of September 30, 2022, and for weeks prior, Neugebauer and, upon information and belief, OnPoint, were aware of the negative article imminently to be published by the WSJ.  Neugebauer and OnPoint were aware of the negative impact the article would have on the Debtor's ability to raise funds and on its go-forward business plan.  The Collateral Agreement was entered into in order to put the interests of Neugebauer, his affiliates, and OnPoint ahead of the interests of the Debtor and its other creditors. *See Matter of Fabricators, Inc.,* 926 F.2d 1458 (5th Cir. 1991) (identifying breach of fiduciary duty, obtaining liens, inducing other creditors to extend credit, and insider loans to undercapitalized company as factors favoring subordination).

159.    Neugebauer and the Collateral Agent engaged in inequitable conduct resulting in injury to other creditors and giving unfair advantage to Neugebauer and the Collateral Agent.

160.    The Trustee requests that the Court subordinate all distributions to Neugebauer (and his affiliates) and the Collateral Agent to all other allowed claims. 11 U.S.C. § 510(c)(1).

161.    The Trustee requests that the Court order the Collateral Agent's liens be transferred to the Estate.  11 U.S.C.§ 510(c)(2).

**COUNT 12:**    **RECHARACTERIZATION (NEUGEBAUER AND COLLATERAL AGENT)**

162.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

163.    Based on the allegations in Count 10, pursuant to the Court's equitable powers and/or state law, recharacterizing the claims of Neugebauer, his affiliates, and OnPoint as equity.

**COUNT 13:**    **DECLARATORY JUDGMENT REGARDING EXTENT OF COLLATERAL AGENT'S SECURITY INTERESTS RESPECTING DE COMPLAINT AND GA COMPLAINT (ALL DEFENDANTS EXCEPT ONPOINT)**

164.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

165.    In the DE Complaint and in the GA Complaint, the Defendants have asserted various causes of action sounding in tort that the Debtor and the Estate could have brought, regardless of whether the Defendants, too, could have brought any such causes of action (all such causes of action, the "Tort Claims").  The "Tort Claims" include causes of action under federal RICO, state RICO, conspiracy to breach contract, misappropriation of trade secrets, infringement of intellectual property rights, breach of fiduciary duty, tortious interference, damage to business, and various other causes of action stemming from the actions the Defendants allege that the DE Defendants and the GA Defendants took.  The "Tort Claims" further include the "Misappropriation Claims" as defined by the Collateral Agent in Bankruptcy Case Docket No. 201.

166.    An actual and present controversy exists regarding whether the Collateral Agent holds any security interests, perfected or otherwise, against any of the Tort Claims alleged in the DE Complaint or the GA Complaint.  The Collateral Agent asserts that it does, including as "proceeds" of its other collateral, at least with respect to Intellectual Property.  *See* Bankruptcy

Case Docket No. 201.  The Trustee disagrees and asserts that no security interest in the Tort Claims in favor of the Collateral Agent ever attached.

167.    The Tort Claims, including any RICO claim and misappropriation claim, are by definition tort claims.  The Debtor is a corporation.  Therefore, under section 9.102(a)(13) of the U.C.C., the Tort Claims are "commercial tort claims."  Under section 9.108(e) of the U.C.C., a description of collateral as a "commercial tort claim" is insufficient and a detailed description thereof is required in order for any security interest to even attach to a commercial tort claim.

168.    Here, the Collateral Agreement listed "commercial tort claims" by category only, and it failed to provide any detail with respect to any of the same, including with respect to any of the Tort Claims.

169.    The Collateral Agent's argument that the Tort Claims are the "proceeds" of its other collateral fails under applicable case law, even assuming that it has a valid security interest with respect to other collateral in the first place, or that it has any claim remaining after its Alleged Foreclosure.  *See, e.g., In re American Cartage Inc.*, 656 F.3d 82 (1st Cir. 2011).

170.    Furthermore, because the Tort Claims are not "proceeds" under the U.C.C., the Estate takes them free of any security interest of the Collateral Agent under section 552 of the Bankruptcy Code.

171.    Those Defendants holding Notes also argue that they have standing to sue for misappropriation and infringement of Intellectual Property as "Grantors" under the Collateral Agreement.  *See* GA Complaint at ¶¶ 185-86.  This is nonsense: the holders of the Notes are not "Grantors" under the Collateral Agreement, and nowhere are the individual holders of Notes granted any security interests.

172.    Accordingly, the Trustee requests judgment to the effect that the Tort Claims are not the collateral of the Collateral Agent or any of the holders of the Notes and are, instead, free and clear property of the Estate.

**COUNT 14:** **OBJECTION TO COLLATERAL AGENT CLAIM**

173.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

174.    Pursuant to 11 U.S.C. § 502(b)(1), the Trustee objects to Claim No. 44 of the Collateral Agent and incorporates herein all other causes of action.

**COUNT 15:** **DECLARATORY JUDGMENT REGARDING OWNERSHIP OF COUNT 1 OF DE COMPLAINT (AGAINST DE PLAINTIFFS)**

175.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

176.    Count 1 of the DE Complaint is labeled "Breach of Contract and Conspiracy to Breach Contract: Stockholders Agreement."

177.    The basis of said Count 1 is breach of contract, and the DE Complaint expressly identifies the breached contract as the "Original Stockholders Agreement" and "that certain Joinder Agreement," and "that certain Subscription Agreement." However, the Debtor was also a party to each of these agreements and, any breach of those agreements by any of the DE Defendants would be enforceable by the Debtor as well.

178.    The breach of these contracts is expressly identified as a breach of section 5.04(c) of the Stockholders Agreement, labeled "Non-Competition," which, among other things, prohibits each signatory thereof from engaging in "Prohibited Activity," which prohibition exists "[b]ecause of the Company's legitimate business interest." "Prohibited Activity" is generally defined as activity whereby such signatory would contribute any knowledge to a company "engaged in, or

developing, the same or similar business as the Company," including the disclosure of trade secrets, proprietary information, or confidential information.

179.    The other basis of said Count 1 is a breach of section 5.04(d) of the Shareholder Agreement, generally prohibiting disparagement.  However, this section prohibits disparagement not only of Debtor's officers and the like, but also of the Debtor and its business.

180.    Therefore, section 5.04(c) protected the Debtor and its property, and any damages for breaching the foregoing would flow to the Debtor first and, if ever, to the DE Plaintiffs only derivatively of the Debtor.  As such, the underlying causes of action and damages are property of the Estate.

181.    Count 1 of the Delaware Complaint appears to assert damages to Neugebauer or his entities as personal to them and not belonging to, or derivative of, the Estate, in an attempt to conceal the fact that they are asserting the Estate's causes of action.  The DE Plaintiffs' characterizations of ownership, however, do not control and are incorrect in any event.  Among other things,

- "GloriFi required Defendants . . . to sign a confidentiality agreement . . . then a Confidentiality and Proprietary Rights Agreement and a Stockholders Agreement," DE Complaint at p. 6;

- "Defendants conspired to prevent GloriFi from obtaining additional financing necessary to complete the SPAC transaction," *id*. at p. 77;

- "Defendants [conspired] to complete with GloriFi by creating, investing in, or otherwise assisting other entities utilizing GloriFi's trade secrets and through other means of unfair competition including, but not limited to use of GloriFi's confidential and proprietary information," *id*. at p. 77;

- "the Defendants capitalized on GloriFi's stolen property," *id*. at p. 79.

182.    It was the *Debtor's* property that was stolen, the *Debtor's* financing ability that was killed, and the *Debtor's* business that was unfairly competed with through thefts, breaches of contract, and torts.

183.     The foregoing, and therefore said Count 1, all allege harm and injury to the Debtor and to its property.  Count 1 and such damages are claims and causes of action that the Debtor could have asserted in its own name.  As such, it is property of the Estate.  To the extent that Neugebauer has any claim for damages, it is indirect and derivative of the Debtor and the Estate and, therefore, any claim or cause of action that he may have is not personal to him with respect to section 5.04(c) of the Shareholder Agreement.  With respect to section 5.04(d) of the Shareholder Agreement, it too protects the Debtor and its business against disparagement, but it also protects the Debtor's individual officers and others.  Here, Count 1 appears to include damages flowing both to the Debtor and to Neugebauer personally.

184.     Accordingly, the Trustee respectfully requests judgment that the Estate, to the exclusion of any of the Defendants, owns: (i) the causes of action and any resulting damages pled in Count 1 of the Delaware Complaint for violation of any agreement regarding the Debtor's property and business opportunities and for violating any agreement regarding disparaging the Debtor or its business; and (ii) all causes of action and any resulting damages, whether for breach of contract, tort, or violation of statute, for any taking, misappropriation, use, conversion, or theft of any intellectual property, including trade secrets, of the Debtor.  To the extent that any portion of said Count 1 is a cause of action that is not property of the Estate, the Trustee requests that the Court declare what any such portion or its resulting damages may be.

**<u>COUNT 16</u>:  DECLARATORY JUDGMENT REGARDING OWNERSHIP OF COUNT 2 OF DELAWARE COMPLAINT (AGAINST NEUGEBAUER)**

185.     The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

186.     By Count 2 of the DE Complaint, Neugebauer asserts a cause of action against the DE Defendants for violations of federal civil RICO laws.

187.    In said Count 2, Neugebauer seeks to shoehorn the cause of action and resulting

damage into a "personal" cause of action for his sole benefit, including by asserting that he has

suffered the resulting damages and seeking such damages only.

188.    The actual allegations underpinning Count 2, however, demonstrate that the cause

of action, and any resulting damages, belongs to the Estate:

- "[t]he RICO Enterprise consist of an association and group of individuals associated in fact . . . for the unlawful purpose of . . . stealing GloriFi's confidential and proprietary information and knowingly using the stolen information to compete against GloriFi,";[7]

- the Defendants did so by "[i]legally downloading GloriFi's confidential and/or proprietary data on or around Nov. 9, 2021 with intent to convert it";[8]

- the Defendants further did so by "[i]legally downloading GloriFi's confidential and/or proprietary data on or around October 2, 2022, with intent to convert it";[9]

- "[c]opying GloriFi's credit card for the benefit of Coign and its owners"; [10]

- "[c]pnverting GloriFi's trade secrets for the benefit of Strive and its owners,";[11] and

- "[k]nowingly stealing or fraudulently obtaining or downloading without authorization or knowingly receiving and/or possessing such information obtained without authorization." [12]

189.    The foregoing, and therefore said Count 2, all allege harm and injury to the Debtor

and to its property.  Count 2 and such damages are claims and causes of action that the Debtor

could have asserted in its own name.  As such, it is property of the Estate.  To the extent that

---

[7] DE Complaint at p. 80.

[8] *Id*. at p. 80.

[9] *Id.* at p. 80.

[10] *Id.* at pp. 81-82.

[11] *Id.* a t p. 81.

[12] *Id.* at p. 81.

Neugebauer has any claim for damages, it is indirect and derivative of the Debtor and the Estate and, therefore, any claim or cause of action that he may have is not personal to him.

190.    Accordingly, the Trustee respectfully requests judgment that the Estate, to the exclusion of any of the Defendants, owns: (i) the causes of action and any resulting damages pled in Count 2 of the DE Complaint; and (ii) all causes of action and any resulting damages, whether for breach of contract, tort, or violation of statute, for any taking, misappropriation, use, conversion, or theft of any intellectual property, including trade secrets, of the Debtor.

**COUNT 17:    DECLARATORY JUDGMENT REGARDING OWNERSHIP OF COUNTS 1, 2, 3, 5, 6, 8, AND 9 OF GA COMPLAINT (AGAINST GA PLAINTIFFS)**

191.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

192.    In Counts 1, 2, 3, 5, 6, 8, and 9, the GA Plaintiffs seeks to shoehorn the cause of action and resulting damage into a "personal" cause of action for their sole benefit, including by asserting that they suffered the resulting damages and seeking such damages only.

193.    The actual allegations underpinning these Counts, however, demonstrate that the causes of action, and any resulting damages, belongs to the Estate:  (i) illegal download of the tech stack;[13] (ii) theft of trade secrets;[14] (iii) copying the Debtor's credit card design for the benefit of Coign;[15] and (iv) converting trade secrets for the benefit of Strive.[16]  Count 4 alleges theft of the

---

[13] GA Complaint paras. 219, 231, 245.

[14] *Id.*

[15] *Id.*

[16] *Id.*

Debtor's credit card design,[17] concept of an anti-woke ETF,[18] and the Debtor's customer targeting strategy,[19] as well as disclosure of trade secrets to competitors.[20]

194.    The foregoing, and therefore the identified Counts, all allege harm and injury to the Debtor and to its property.  Said counts and such damages are claims and causes of action that the Debtor could have asserted in its own name.  As such, it is property of the Estate.  To the extent that Neugebauer has any claim for damages, it is indirect and derivative of the Debtor and the Estate and, therefore, any claim or cause of action that he may have is not personal to him.

195.    Accordingly, the Trustee respectfully requests judgment that the Estate, to the exclusion of any of the Defendants, owns: (i) the causes of action and any resulting damages pled in Counts 1, 2, 3, 5, 6, and 8 of the GA Complaint; and (ii) all causes of action and any resulting damages, whether for breach of contract, tort, or violation of statute, for any taking, misappropriation, use, conversion, or theft of any intellectual property, including trade secrets, of the Debtor.

**COUNT 18: DECLARATORY JUDGMENT REGARDING OWNERSHIP OF COUNT 4 OF GA COMPLAINT (AGAINST WPI)**

196.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

197.    By Count 4 of the GA Complaint, WPI directly asserts causes of action for the misappropriation of the Debtor's trade secrets and other intellectual property, and seeks resulting damages for itself.

---

[17] GA Complaint para. 258.

[18] *Id.*

[19] *Id.*

[20] *Id.*

198.    The sole justification that WPI gives in asserting the Debtor's causes of action and damages, and therefore the Estate's, is that it "now owns GloriFi's Intellectual Property, including 'all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.' Therefore, it has the right to recover damages due to the misappropriation, infringement, and/or dilution of that Intellectual Property." GA Complaint at ¶ 261.   Of interest, the Collateral Agent provides no citation for its quotation above.

199.    Even if the Collateral Agent holds a security interest to the causes of action and damages the subject of said Count 4, that is not ownership of said Count 4.

200.    The only possible way that the Collateral Agent could own said Count 4 is from the Alleged Foreclosure.  However, and as alleged above: (i) the Alleged Foreclosure transferred, at best, the Software and the Software Assets, which do <u>not</u> include causes of action or anything approaching Count 4; (ii) the Alleged Foreclosure was invalid and ineffective to transfer anything because there was no "Event of Default," no acceleration of the Notes, and, upon information and belief, no approval or instruction to foreclose from the Requisite Noteholders; and (iii) the Collateral Agreement does not grant a security interest in commercial tort claims, which is what Count 4 is; and (iv) the Collateral Agreement does not grant any security interests to the Collateral Agent because the Notes fail to define "Obligations" and therefore the Collateral Agreement fails to define "Company Obligations."

201.    Therefore, Count 4 was and is property of the Debtor and the Estate, free and clear of any purported security interest in favor of the Collateral Agent.

202.    Accordingly, the Trustee respectfully requests judgment that the Estate, to the exclusion of WPI, owns: (i) the causes of action and any resulting damages pled in Count 4 of the GA Complaint; and (ii) all causes of action and any resulting damages, whether for breach of

contract, tort, or violation of statute, for any taking, misappropriation, use, conversion, or theft of any intellectual property, including trade secrets, of the Debtor.

**COUNT 19:** **DECLARATORY JUDGMENT REGARDING OWNERSHIP OF COUNT 7 OF GEORGIA COMPLAINT (AGAINST NEUGEBAUER AND NFE)**

203.    The Trustee hereby incorporates all factual allegations set forth above and below, throughout this Complaint, as though fully stated here.

204.    By Count 7 of the GA Complaint, Neugebauer and NFE assert a cause of action against the GA Defendants for "Conspiracy to Breach Contract: Stockholders Agreement." As expressly pled, Neugebauer and NFE are suing defendants who are not signatories to the Stockholders Agreement but who allegedly conspired with those who were in breach of those agreements.

205.    The basis of said Count 7 is breach of contract, without which there is no conspiracy, and the GA Complaint expressly identifies the breached contract as the "Stockholders Agreement" and the "Amended and Restated Stockholders Agreement." However, the Debtor was also a party to each of these agreements and, any breach of those agreements by any of the GA Defendants would be enforceable by the Debtor as well.

206.    The breach of these contracts is expressly identified as a breach of section 5.04(c) of the Stockholders Agreement, labeled "Non-Competition," which, among other things, prohibits each signatory thereof from engaging in "Prohibited Activity," which prohibition exists "[b]ecause of the Company's legitimate business interest." "Prohibited Activity" is generally defined as activity whereby such signatory would contribute any knowledge to a company "engaged in, or developing, the same or similar business as the Company," including the disclosure of trade secrets, proprietary information, or confidential information.

207.     Likewise, the breach of these contracts is expressly identified as a breach of section 5.04(e) of the Amended Stockholders Agreement, which prohibited the disclosure of "Confidential Information."   "Confidential Information" is defined as "confidential, secret, and proprietary" information "relating to the Company and its Affiliates, businesses and existing and prospective customers . . .".

208.     The other basis of said Count 7 is a breach of section 5.04(d) of the Shareholder Agreement, generally prohibiting disparagement.  However, this section prohibits disparagement not only of Debtor's officers and the like, but also of the Debtor and its business.

209.     Therefore, section 5.04(c) and amended section 5.04(e) protected the Debtor and its property, and any damages for breaching the foregoing would flow to the Debtor first and, if ever, to the GA Plaintiffs only derivatively of the Debtor.  As such, the underlying causes of action and damages are property of the Estate.

210.     Count 7 of the GA Complaint appears to assert damages to Neugebauer or his entities as personal to them and not belonging to, or derivative of, the Estate, in an attempt to conceal the fact that they are asserting the Estate's causes of action.  The GA Plaintiffs' characterizations of ownership, however, do not control and are incorrect in any event.  Among other things:

- the defendants "conspired with the entities they controlled and the rest of the Defendants to assist the signatories of the Stockholders Agreement in violating *their* obligations through the underlying torts of defamation, business disparagement, unfair competition, and theft of trade secrets," *see* GA Complaint at pp. 129-130;

- "Defendants conspired to prevent GloriFi from obtaining additional financing necessary to complete the SPAC transaction," *id*. at p. 130;

- "Defendants [conspired] to compete with GloriFi by creating, investing in, or otherwise assisting other entities utilizing GloriFi's trade secrets and through other means of unfair competition including, but not limited to, use of GloriFi's confidential and proprietary information," *id*. at p. 130;

- "Defendants wrongfully utilized GloriFi trade secrets, proprietary information, and confidential information in founding Strive, taking GloriFi's concept of Anti-Woke energy ETF," *id*. at p. 132; and

- "Coign misappropriated GloriFi's trade secrets by, among other things, copying GloriFi's credit card design. *Id*. at p. 133.

211.    It was the *Debtor's* property that was stolen, the *Debtor's* financing ability that was killed, and the *Debtor's* business that was unfairly competed with through thefts, breaches of contract, and torts.

212.    The foregoing, and therefore said Count 7, all allege harm and injury to the Debtor and to its property.  Count 7 and such damages are claims and causes of action that the Debtor could have asserted in its own name.  As such, it is property of the Estate.  To the extent that Neugebauer has any claim for damages, it is indirect and derivative of the Debtor and the Estate and, therefore, any claim or cause of action that he may have is not personal to him with respect to section 5.04(c) of the Shareholder Agreement or section 5.04(e).  With respect to section 5.04(d) of the Shareholder Agreement, it too protects the Debtor and its business against disparagement, but it also protects the Debtor's individual officers and others.  Here, Count 7 appears to include damages flowing both to the Debtor and to Neugebauer personally.

213.    Accordingly, the Trustee respectfully requests judgment that the Estate, to the exclusion of any of the Defendants, owns: (i) the causes of action and any resulting damages pled in Count 7 of the GA Complaint for violation of any agreement regarding the Debtor's property and business opportunities and for violating any agreement regarding disparaging the Debtor or its business; and (ii) all causes of action and any resulting damages, whether for breach of contract, tort, or violation of statute, for any taking, misappropriation, use, conversion, or theft of any intellectual property, including trade secrets, of the Debtor.  To the extent that any portion of said

Count 7 is a cause of action that is not property of the Estate, the Trustee requests that the Court

declare what any such portion or its resulting damages may be.

**COUNT 20:** **PERMANENT** **INJUNCTION** **ENFORCING** **THE** **AUTOMATIC** **STAY** (**ALL**
**DEFENDANTS EXCEPT ONPOINT**)

214.    The Trustee hereby incorporates all factual allegations set forth above and below,

throughout this Complaint, as though fully stated here.

215.    The causes of action asserted in the DE Complaint and the GA Complaint are

property of the Estate.  As such, they are subject to the sole and exclusive administration of the

Trustee and the sole and exclusive prosecution by the Trustee, all protected by the automatic stay.

To the extent that any of such causes of action are not property of the Estate, that question will be

determined by this Court through this Adversary Proceeding, as a determination that this Court

has the exclusive jurisdiction over.

216.    Accordingly, the Trustee requests the issuance of a permanent injunction

prohibiting any of the Defendants or their successors from asserting or prosecuting, in any manner

and before any court or other tribunal, any of the causes of action asserted in the DE Complaint or

the GA Complaint except solely those causes of action, and underlying allegations and resulting

damages, that this Court determines are not property of the Estate.

**COUNT 21:** **DAMAGES FOR VIOLATIONS OF THE AUTOMATIC STAY** (**ALL DEFENDANTS**
**EXCEPT ONPOINT**)

217.    The Trustee hereby incorporates all factual allegations set forth above and below,

throughout this Complaint, as though fully stated here.

218.    By filing the DE Complaint and the GA Complaint, and taking any action to

advance either or both such proceedings, the Defendants (except OnPoint) have and continue to

exercise control over property of the Estate in direct violation of section 362(a)(3) of the

Bankruptcy Code.  This is because, for all of the reasons presented above, the causes of action and

damages asserted by them in the DE Complaint and the GA Complaint are property of the Estate protected by the automatic stay of the Bankruptcy Code.

219.    Even to the extent that any such causes of action or damages may be personal to one or more of the Defendants (except OnPoint), unless and until there is a judicial determination of the same or allocating any portion thereof between the Estate and the Defendant, all such causes of action are arguably property of the Estate likewise protected by the automatic stay of the Bankruptcy Code.

220.    At no time did any of the Defendants obtain relief from the automatic stay to file or prosecute any of the causes of action the subject of the DE Complaint or the GA Complaint.

221.    Under section 362(k) of the Bankruptcy Code, "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

222.    The Trustee is an individual within the meaning of said section.

223.    To the extent that he is not, or to the extent that section 362(k) does not otherwise directly apply, section 105(a) of the Bankruptcy Code and the Court's inherent powers to enforce a statutory injunction similar to the automatic stay enable the Court to sanction violations of the automatic stay and to award appropriate damages for violations.

224.    Here, the Estate has been damaged, resulting in actual damages to be proven at trial, because the Trustee's Court-approved auction of the Tort Claims (and pending motion for sale of the same) has been potentially depressed with respect to interest and to value, because the Defendants not only claim ownership of the Tort Claims but have actually initiated litigation to recover the Tort Claims for themselves.

225.    The Estate has been further damages by its attorney's fees and expenses incurred as a result of the filing of the DE Case and GA Case including preparing and prosecuting this

Adversary Proceeding and, should it become necessary, incurred in the DE Case and the GA Case. These fees are asserted as both actual damages and as attorney's fee damages.

226.    Punitive damages are also appropriate.  Among other things: (i) the Defendants were warned not to proceed with the DE Complaint or the GA Complaint without first obtaining judicial relief; (ii) the Defendants filed the DE Complaint and the GA Complaint for the obvious purpose of prejudicing the Trustee's action of the Tort Claims, as they knew that they did not have the funds to prevail at said auction and that they did not have perfected security interests to credit-bid at said action; (iii) the Collateral Agent, on May 22, 2024, filed a motion for relief from the automatic stay with respect to the Tort Claims but had already filed the DEGA Complaints; (iv) the filing of the DE Complaint and the GA Complaint was motivated by Neugebauer and entities that he controls to get his version of events out, meaning that he used the judicial system for propaganda and publicity; (v) amazingly, Neugebauer had previously sought to enforce the automatic stay and to obtain damages for its violations—which this Court granted to him—for a very similar automatic stay violation committed by others (including some of the DEGA Defendants); and (vi) in light of this Court's precedent, the automatic stay violations are clear because, as this Court has made it clear, "do not ask for forgiveness afterwards, ask for permission beforehand."

227.    In sum, the contempt for the automatic stay and of this Court is overwhelming and hard to comprehend, as are the resulting damages.  This is no innocent or technical violation.  There were no limitations or other issues faced by the Defendants.  Defendants simply resorted to self-help, exactly what the automatic stay forbids.  And, they decided for themselves what is and is not property of the Estate, usurping this Court's role which the automatic stay exists to enable without fear of parallel proceedings.  The Court should therefore not hesitate to award the maximum

damages, fees, and punitive damages to the Trustee including, if needed, for punitive damages by way of inherent contempt powers, by report and recommendation to the District Court.

228.    Accordingly, the Trustee requests a money judgment against the Defendants, jointly and severally, for all damages resulting from their violations of the automatic stay, including all of the Trustee's reasonable attorney's fees and expenses, and further including such punitive damages as the Court deems appropriate to deter other violations of the automatic stay.

## VI.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that the Defendants be summoned to answer this Complaint and that, following a trial on the merits, the Court award the Trustee or otherwise enter judgment in favor of the Trustee as against the appropriate Defendants for:

a.  A declaratory judgment that (i) the sole property of the Debtor transferred to the Collateral Agent was the software that was being developed by or on behalf of the Debtor for its business, including but not limited to source code, object code, scripts, programming tools, diagrams, documentation, presentations, correspondence and notes relating to the Software, any hardware used in connection with the Software, as well as any other tangible or intangible asset of the Company or its agents related to the Software, wherever located; and (ii) the Collateral Agent did not foreclose on, receive, or acquire any of the Debtor's Intellectual Property, General Intangibles, trade secrets, causes of action, rights against third parties, or any of the claims and causes of action asserted by the Collateral Agent in the GA Complaint;

b.  A declaratory judgment that the Alleged Foreclosure was invalid and ineffective under the underlying agreements and the UCC and, therefore, transferred none of the Debtor's property to the Collateral Agent;

c.  A declaratory judgment that the Collateral Agent's lien did not attach to the Debtor's Trademarks;

d.  An injunction prohibiting the Collateral Agent, any successor thereof, and any holder of any Note, from making any statement, or taking any action indicative, of ownership or control of, or dominion over, any property of the Estate that is the subject of the Court's grant of relief to the Trustee;

e.  In connection with the wrongful foreclosure, award against OnPoint and WPI such money damages to be proven at trial or a declaration of no deficiency claim of the Collateral Agent or Noteholders;

f.  In connection with breach of the Collateral Agreement, money damages to be proven at trial,

g.  Pursuant to 11 U.S.C. § 547, avoidance of the attachment or perfection of any security interests in favor of the Collateral Agent and/or any Note Insider(s) or, alternatively, avoiding the perfection of any attached security interest as stated herein;

h.  Pursuant to 11 U.S.C. § 550, recovery of all liens, security interests, and transfers avoided pursuant to this Complaint and of all other transferred assets or their value, in amounts to be determined at trial;

i.  Pursuant to 11 U.S.C. § 510(c), equitable subordination of the claims of Neugebauer, his affiliates, and OnPoint;

j.  Pursuant to the Court's equitable powers and/or state law, recharacterizing the claims of Neugebauer, his affiliates, and OnPoint as equity;

k.  A declaratory judgment to the effect that the Tort Claims are not the collateral of the Collateral Agent or any of the holders of the Notes and are, instead, free and clear property of the Estate;

l.  A declaratory judgment that the Estate owns all counts asserted in the DE and GA Complaints and the damages resulting therefrom, or, to the extent that any portion of the same is a cause of action and/or seeks direct damages that are not property of the Estate, a declaratory judgment declaring what any such portion or its resulting damages may be;

m.  A permanent injunction enforcing the automatic stay;

n.  Damages for violations of the automatic stay, in an amount to be proven at trial;

o.  Punitive damages for violation of the automatic stay, in an amount determined by the Court to be just and proper;

p.  Pursuant to 11 U.S.C. § 502(b)(1), disallowing the Collateral Agent's claim;

q.  Reasonable attorney's fees and expenses incurred herein;

r.  Prejudgment and post judgment interest as allowed by law; and

s.  Such other and further relief to which the Trustee has shown himself justly entitled, whether at law or in equity.

RESPECTFULLY SUBMITTED this 30th day of May, 2024.

By: /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Brenda P. Funk, Esq.
Texas Bar No. 24012664
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500

COUNSEL FOR
SCOTT M. SEIDEL, TRUSTEE