

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

*Michelle V. Larson*

**Signed January 2, 2026**

_____
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 7 |
| WITH PURPOSE, INC., | § § | Case No. 23-30246-MVL7 |
| Debtor. | § § | |

| | | |
|---|---|---|
| SCOTT M. SEIDEL, TRUSTEE, | § § § | |
| Plaintiff, | § § | |
| v. | § § § | Adv. Pro. No. 24-3038-MVL |
| TOBY NEUGEBAUER; BANZAI ADVISORY GROUP, LLC; BANZAI CAPITAL PARTNERS, LLC; NEUGEBAUER FAMILY ENTERPRISES, LLC; WPI COLLATERAL MANAGEMENT, LLC; and ONPOINT COMPANIES, LLC, | § § § § § § § § § | |
| Defendants. | § § | |

1

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER DAMAGES PORTION OF TRIAL

This Court issues the following findings of fact and conclusion of law after the damages portion of the trial that took place on August 14, 2025 (the "**Damages Trial**"), which followed upon the *Memorandum Opinion* [ECF No. 145][1] issued by this Court with respect to the initial trial conducted on the *First Amended Complaint* (the "**Complaint**") filed by Plaintiff Scott M. Seidel (the "**Trustee**"), the duly appointed Chapter 7 Trustee for the bankruptcy estate of With Purpose, Inc. (the "**Debtor**"), against Defendants Toby Neugebauer, Banzai Advisory Group, LLC ("**Banzai Advisory**"), Banzai Capital Partners, LLC ("**Banzai Capital**"), Neugebauer Family Enterprises, LLC ("**NFE**", together with Mr. Neugebauer, Banzai Advisory, and Banzai Capital, the "**Neugebauer Parties**"), WPI Collateral Management (the "**Collateral Agent**"), and OnPoint Companies, LLC ("**OnPoint**", together with the Neugebauer Parties and the Collateral Agent, the "**Defendants**"). ECF No. 44. The Court originally conducted a four-day trial from December 9 through December 12, 2024. The Court heard the testimony of seven fact witnesses and two expert witnesses. At the conclusion of the trial, the Court took the matter under advisement and allowed the parties to submit post-hearing briefing. On January 6, 2025, the Collateral Agent [ECF No. 136], the Trustee [ECF No. 135], and Jackson Investment Group [ECF No. 134] all filed post-hearing briefs apprising the Court of their varying positions.

On June 17, 2025, the Court issued its Memorandum Opinion containing its findings of fact and conclusions of law with respect to the trial and reserved any judgment as to damages for the Collateral Agent's and the Neugebauer Parties' violations of the automatic stay until a further

---

[1] Unless otherwise stated, all ECF No. references are herein made with respect to the docket in Adversary Proceeding No. 24-3038-mvl.

2

damages trial could be conducted. ECF No. 145 at 96.  Likewise, OnPoint's Crossclaim (as

hereinafter defined) was set for further trial.

Pursuant to the *Agreed Scheduling Order for Damages Phase of Trial* [ECF No. 148], by

July 21, 2025, the Trustee was required to file with the Court, and serve on all of the Defendants,

all exhibits he intended to use to prove up any damages, including segregated time entries and

invoices.

The Defendants had until August 4, 2025, to file an objection detailing each time entry and

expense that they asserted was not recoverable by the Trustee as damages pursuant to the

Memorandum Opinion. Likewise, any objection filed was required to state in summary form the

basis thereof. Such objection could include: (1) the reasonableness of the time spent; (2) the

reasonableness of the hourly rate applied; (3) whether the time is related to the subject of the

damages in the Memorandum Opinion; (4) whether there was a proper allocation or segregation

of such time; (5) whether the Defendant believed the time is attributable to the violation of stay

referenced in the Memorandum Opinion or would have been incurred regardless of said violation;

and (6) anything else that the Defendants wished to assert in good faith.

The Trustee timely filed his evidence, namely, time and expense records of his counsel,

Munsch Hardt Kopf & Harr PC ("**Munsch Hardt**"), on July 21, 2025. ECF No. 154. The

Defendants timely filed their *Objection to the Trustee's Request for Damages. See* ECF No. 159;

*see also Supplemental Objection to the Trustee's Request for Damages,* ECF No. 164. Except as

described herein as to "categorical objections", the Defendants did not object to any specific time

entry or expense of the Trustee on a reasonableness basis.

As stated above, the Damages Trial took place on August 14, 2025.  Three witnesses

testified in connection with the stay violation portion of the Damages Trial: (1) Thomas Berghman

of Munsch Hardt, counsel to the Trustee; (2) the Trustee; and (3) J. Paul Manning, the managing member of the Collateral Agent. As part of the Damages Trial, the Court also heard the Request for Declaratory Relief (the "**Crossclaim**") filed by OnPoint for indemnification against all of the remaining Defendants, seeking "complete indemnification from the Trustee, as successor-in-interest to the Debtor, . . . for any liability, attorneys' fees, costs and expenses that it may incur in connection with this adversary proceeding, pursuant to the Collateral Agreement and all rights reserved thereunder." ECF No. 14. During the Damages Trial, OnPoint waived any request for judgment against the Collateral Agent, Banzai Advisory or Mr. Manning. OnPoint asserted a joint and several indemnification claim against the Debtor and the Series 2 Noteholders that are Defendants in the Adversary Proceeding, Toby Neugebauer, NFE and Banzai Capital, in the amount of $151,610.94. Two witnesses testified in connection with the Crossclaim: (1) J. Reed Williams, a managing partner of OnPoint; and (2) Steven Holmes, a partner with Cavazos Hendricks Poirot, PC ("**Cavazos Hendricks**"), counsel to OnPoint. The Trustee and OnPoint entered into an agreement prior to the trial, where the Trustee agreed to a judgment by way of a $112,500 allowed general unsecured claim against the estate in satisfaction of the Debtor's liability in connection with the Crossclaim.

Unless otherwise stated herein, the Court hereby incorporates the findings of fact and conclusions of law from the Memorandum Opinion as if set forth at length herein. Defined terms not defined herein shall adhere to the meanings ascribed to such terms in the Memorandum Opinion. The following constitutes the Court's findings of fact and conclusion of law as to the Damages Trial.[2]

## GENERAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

[2] Any findings of fact that constitute conclusions of law shall be deemed such and *vice versa*.

1. This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §
   1334.

2. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(B), (F), (G), (H), (K), and (O).
   The bankruptcy court has authority to adjudicate this matter pursuant to United States
   District Court for the Northern District of Texas Miscellaneous Order No. 33. The Court
   finds that the parties have consented to this Court's jurisdiction to enter final judgment in
   this case because there have been no objections as to this Court's jurisdiction either before
   trial or at trial. *See In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 573–74 (5th Cir.
   2024).

3. Venue is proper in this District pursuant to 28 U.S.C. § 1408.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATIVE TO ONPOINT'S CROSSCLAIM FOR INDEMNIFICATION

4. On September 30, 2022, the Debtor and OnPoint executed that certain *Guarantee and
   Collateral Agreement* (the "**Collateral Agreement**") [ECF No. 167-2] and the same
   parties, along with the Series 2 Noteholders, entered into that certain *Collateral Agency
   Agreement* (the "**Agency Agreement**") [ECF No. 167-3] of even date.

5. Section 2.8 of the Agency Agreement provides for an indemnity of OnPoint as the
   Collateral Agent. Section 2.8 provides in part:

   > Whether or not the transactions contemplated by the Note Documents are
   > consummated, each of the Grantors agrees, jointly and severally with the other
   > Grantors, to indemnify, defend and hold harmless the Collateral Agent, its Affiliates
   > and their respective managers, directors, officers, employees, agents and
   > representatives (collectively, the "***Indemnified Parties***") from and against any and
   > all claims, liabilities (including environmental liabilities), obligations, losses,
   > damages, penalties, judgments, costs, expenses (including the reasonable fees and
   > expenses of its agents and counsel and taxes (other than taxes based upon, measured
   > by or determined by the income of the Collateral Agent)) and disbursements of any
   > kind or nature whatsoever ("***Losses***") that may be imposed on, incurred by, or
   > asserted against an Indemnified Party by any Person (including any Holder) in any

way relating to or arising out of (a) this Agreement or the other Note Documents and the transactions contemplated hereby and thereby (including, without limitation, any amendments, waivers or releases, enforcement of this Agreement or any other Note Document) or (b) any action taken or omitted by the Collateral Agent; provided that the Grantors will not be liable to an Indemnified Party for any portion of such Losses resulting directly from such Person's gross negligence or willful misconduct as determined by a final judgment (no longer subject to appeal or review) of a court of competent jurisdiction.

ECF No. 167-3 at 8–9.

6. The continuing nature of this indemnification obligation is provided in Section 2.13 of the Agency Agreement, which states that: "The obligations of the Grantors and the Holders under this Article II shall survive the termination of this Agreement (including, without limitation, any termination under bankruptcy law) and the resignation or removal of the Collateral Agent." ECF No. 167-3 at 11.

7. The Grantors include the Debtor and each Series 2 Noteholder that becomes party to the Collateral Agreement. ECF No. 167-2 at 2; ECF No. 167-3 at 1. NFE and Banzai Capital are Grantors (as Series 2 Noteholders), and, in fact, signed the Agency Agreement. ECF No. 167-3 at 31–32. Mr. Neugebauer is an individual Series 2 Noteholder and the managing member of NFE and Banzai Capital. *Id.*

8. The Collateral Agreement also contains an indemnification provision in which the Debtor and the other Grantors agreed to indemnify OnPoint. Section 8.3 of the Collateral Agreement provides in relevant part:

THE GRANTORS, JOINTLY AND SEVERALLY, HEREBY AGREE TO INDEMNIFY, EXONERATE THE COLLATERAL AGENT AND EACH OF THE OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES AND AGENTS OF THE COLLATERAL AGENT (EACH A "LENDER PARTY") FREE AND HARMLESS FROM AND AGAINST ANY AND ALL ACTIONS, CAUSES OF ACTION, SUITS, LOSSES, LIABILITIES, DAMAGES AND EXPENSES, INCLUDING ATTORNEY COSTS (COLLECTIVELY, THE "INDEMNIFIED LIABILITIES"), INCURRED BY THE LENDER PARTIES OR ANY OF THEM AS A RESULT OF, OR ARISING OUT OF, OR RELATING TO (A) ANY TENDER OFFER, MERGER, PURCHASE OF CAPITAL SECURITIES,

PURCHASE OF ASSETS OR OTHER SIMILAR TRANSACTION FINANCED OR PROPOSED TO BE FINANCED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, WITH THE PROCEEDS OF ANY OF THE ADVANCES, [(B) – (D) ENVIRONMETAL LIABILITIES], OR (E) THE EXECUTION, DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT BY ANY OF THE LENDER PARTIES, EXCEPT FOR ANY SUCH INDEMNIFIED LIABILITIES ARISING ON ACCOUNT OF THE APPLICABLE LENDER PARTY'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL, NONAPPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION. . . . ALL OBLIGATIONS PROVIDED FOR IN THIS SECTION 8.3 SHALL SURVIVE REPAYMENT OF ALL (AND SHALL BE) SECURED OBLIGATIONS (AND TERMINATION OF ALL COMMITMENTS UNDER THE CREDIT AGREEMENT), ANY FORECLOSURE UNDER, OR ANY MODIFICATION, RELEASE OR DISCHARGE OF, ANY OR ALL OF THE NOTE DOCUMENTS AND TERMINATION OF THIS AGREEMENT.

ECF No. 167-2 at 27–28 (emphasis in original).

9. The Debtor and the other Grantors also committed to reimbursement of OnPoint's expenses under the Agency Agreement. Section 2.7 of the Agency Agreement provides that:

Each of the Grantors agrees to reimburse or advance, upon demand by the Collateral Agent, all reasonable and documented out-of-pocket costs and expenses (including reasonable counsel fees and expenses) incurred, or anticipated to be incurred, by the Collateral Agent, in connection with the performance of, and/or analysis of, its duties and/or rights under this Agreement or the other Note Documents, including but not limited to any amendments, waivers or releases, the realization upon or protection of the Collateral or enforcing or defending any lien upon or security interest in the Collateral or any other action taken in accordance with this Agreement or the other Note Documents. For the avoidance of doubt, each of the Grantors agrees to reimburse or advance, upon demand by the Collateral Agent, for any costs or out-of-pocket expenses (including attorneys' fees and expenses) incurred by the Collateral Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Note Document, or any document contemplated by or referred to herein.

ECF No. 167-3 at 8–9.

10. Section 8.4 of the Collateral Agreement contains an additional provision addressing the obligation of the Grantors to reimburse OnPoint, as the Collateral Agent thereunder:

> (a) Each Grantor agrees, on a joint and several basis, to pay or reimburse on demand the Collateral Agent for all reasonable out-of-pocket costs and expenses (including Attorneys Costs) incurrent in collecting against any Guarantor under the guaranty contained in Section 2 of this Agreement or otherwise enforcing or preserving any rights under this Agreement and the other Note Documents.
>
> . . .
>
> (b) The agreements in this Section 8.4 shall survive repayment of all (and shall be) Secured Obligations (and termination of the Commitments), any foreclosure under, or any modification, release or discharge of, any or all of the Collateral Documents and termination of this Agreement.

ECF No. 167-2 at 28.

11. On May 3, 2024, a notice was filed in the main bankruptcy case entitled *Notice of Substitution of Collateral Agent* [Bankruptcy ECF No. 193] (the "**Substitution Notice**"). The Substitution Notice attaches the *Notice of Resignation and Agreement Regarding Appointment of Successor Collateral Agent* dated April 22, 2024 [Bankruptcy ECF No. 193-1] (the "**Resignation Agreement**"). ECF No. 167-4.

12. In the Resignation Agreement, OnPoint resigned its appointment as Collateral Agent under the Agency Agreement and Collateral Agreement and reserved its indemnification rights. ECF No. 167-4 at 5.

13. OnPoint was sued by the Trustee as part of the above-captioned adversary proceeding relating to its foreclosure on the Debtors' assets, including the Series 2 Noteholders' Collateral.

14. OnPoint incurred reasonable and necessary attorney's fees and expenses as part of this lawsuit; namely, $151,610.94 comprised of $147,177.50 in fees and $6,727.14 in expenses incurred from June 1, 2024, to March 2025. Counsel for OnPoint voluntarily reduced its

fees by approximately $11,000. ECF No. 167-1. The evidence reflected that OnPoint has paid all the fees requested as part of its indemnification claim.

15. The amount of attorney's fees and expenses is both limited in time as to the date on which OnPoint became aware of the Complaint and segregated as to litigation expenses incurred by OnPoint in connection therewith. OnPoint did not seek indemnification for any other advice, consent, or matters.

16. Pursuant to the terms of the Agency Agreement and the Collateral Agreement, the Debtor and each of the Series 2 Noteholders, as Grantors, committed to indemnify OnPoint for actions taken in its capacity as Collateral Agent, and reimburse OnPoint for all of costs and expenses (including attorney's fees), expressly including expenses relating to the enforcement of the Collateral Agreement.

17. Further, the obligations of indemnity and reimbursement survived termination of the Agency Agreement, the Collateral Agreement and the bankruptcy of the Debtor. The scope of these indemnities is broad and includes enforcement actions taken by the Collateral Agent under the relevant documents.

18. The sole exception contained in Section 8.3 of the Collateral Agreement is for injury "resulting directly from [the indemnified party's] gross negligence or willful misconduct" as determined by a final judgment of a court. ECF No. 167-2 at 27–28. No party alleged that the actions of OnPoint constituted gross negligence or willful misconduct.

19. Under Texas law, which governs the Collateral and Agency Agreements, "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 484 (Tex. 2019)

(citation omitted) (internal quotations omitted). In this case, the Collateral Agreement and the Agency Agreement shift the obligation to the Grantors.

20. Under the lodestar analysis adopted by the Supreme Court of Texas, the first step in the analysis in calculating an attorney's fee award is "determining the reasonable hours worked multiplied by a reasonable hourly rate." *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 354 (Tex. 2020) (quoting *Rohrmoos*, 578 S.W.3d at 498).

21. The burden is on the claimant to show that the requested fees are reasonable. *Id.* To satisfy the burden, the claimant's evidence should include, at a minimum, evidence of: "(1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.*

22. In *Rohrmoos*, the Texas Supreme Court noted what bankruptcy courts typically refer to as the *Johnson* factors to determine reasonableness:

> (1) the time and labor required;
> (2) the novelty and difficulty of the questions;
> (3) the skill requisite to perform the legal service properly;
> (4) the preclusion of other employment by the attorney due to acceptance of the case;
> (5) the customary fee;
> (6) whether the fee is fixed or contingent;
> (7) time limitations imposed by the client or the circumstances;
> (8) the amount involved and the results obtained;
> (9) the experience, reputation, and ability of the attorneys;
> (10) the "undesirability" of the case;
> (11) the nature and length of the professional relationship with the client; and
> (12) awards in similar cases.

*Rohrmoos*, 578 S.W.3d at 490–91 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).

23. The Court finds there to be no colorable defense or basis for disallowance of either the liability for indemnification or the amounts requested. There was no substantive challenge to the reasonableness of OnPoint's fee and expenses.

24. The fees and expenses billed by counsel to OnPoint, Cavazos Hendricks [ECF No. 167-1], were below market and constituted reasonable fees and expenses. The fees and expenses were reasonable in the amount of time required to perform the services, and the hourly rate for each person performing such services. The attorneys at Cavazos Hendricks are skilled, reputable attorneys, respected in their field.

25. Considering the aforementioned *Rohrmoos* and *Johnson* factors, OnPoint is awarded an indemnification claim against Banzai Capital, NFE, and Toby Neugebauer in the amount of $151,610.94 (the "**OnPoint Damages Award**") in accordance with the terms of the Collateral and Agency Agreements, without restriction to the pro rata ownership of the Series 2 Notes.  Banzai Capital, NFE, and Toby Neugebauer are liable jointly and severally for the OnPoint Damages Award.

26. Per the agreement with the Trustee, OnPoint is further awarded an agreed judgment in the amount of $112,500.00 (the "**Allowed Indemnification Claim**") as an allowed general unsecured claim against the Debtor's estate.

27. Notwithstanding the foregoing, OnPoint is only allowed one recovery on the Allowed Indemnification Claim and the OnPoint Damages Award in the total amount of $151,610.94.

28. However, should the judgment relating to the OnPoint Damages Award or the Allowed Indemnification Claim be appealed, $75,000.00 shall be added to the judgment related thereto for OnPoint's attorney's fees relative to an appeal to the District Court and an

additional $75,000 for OnPoint's attorney's fees relative to an appeal to the Fifth Circuit Court of Appeals. These amounts shall be in addition to post-judgment interest at the federal judgment rate if such judgment is not paid within 14 days after entry of the Judgment.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATIVE TO DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY (COUNTS 20–21)

29. The automatic stay is designed to afford debtors "breathing space" to reorder their affairs, make peace with their creditors, and enjoy a clear field for future effort. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 532 (1984); *In re Chesnut*, 422 F.3d 298, 301 (5th Cir. 2005); *In re Nilhan Dev., LLC*, 622 B.R. 795, 800 (Bankr. N.D. Ga. 2020). The Bankruptcy Code provides that a creditor must stay all proceedings against a debtor and its property after the debtor files a petition for bankruptcy. 11 U.S.C. § 362(a)(1). A Chapter 7 trustee enjoys the same benefits of the imposition of the automatic stay. Section 362(a)(3) operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." *Id.* at § 362(a)(3). The stay of acts "against the debtor" is to be strictly construed. *Nilham*, 622 B.R. at 800; *In re Kay Bee Kay Props., LLC*, 618 B.R. 486, 491 (Bankr. E.D. Mich. 2020); *In re Cincom iOutsource, Inc.*, 398 B.R. 223, 227 (Bankr. S.D. Ohio 2008) (citing *Patton v. Bearden*, 8 F.3d 343, 350 (6th Cir. 1993)).

30. When a bankruptcy petition is filed, the automatic stay operates as a self-executing injunction preventing creditors from taking "any act to obtain property of the estate or of property of from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). A willful violation of the automatic stay means acting with *knowledge* of the stay:

> A willful violation does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation must be awarded.

*Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 355 (5th Cir. 2008) (quoting

*Chesnut*, 422 F.3d at 302).

31. To establish an actionable violation of the automatic stay pursuant to § 362(k), the Trustee must establish that: (1) the Collateral Agent and the Neugebauer Parties knew of the existence of the stay; (2) the Collateral Agent's and the Neugebauer Parties' actions were willful; and (3) the Collateral Agent's and the Neugebauer Parties' actions violated the stay. *See id.* (citing *In re Repine*, 536 F.3d 512, 519 (5th Cir. 2008)).

32. As the Court previously found in the Memorandum Opinion, it is unquestionable that the Collateral Agent and the Neugebauer Parties knew of the existence of the automatic stay. Mr. Neugebauer is the authorized representative of the Debtor that signed the bankruptcy petition putting the Debtor into bankruptcy on February 8, 2023. Bankruptcy ECF No. 1. The Neugebauer Parties and the Collateral Agent shared counsel for much of the bankruptcy proceedings.  The Collateral Agent participated in the bankruptcy proceeding from the moment it was formed.

33. Counsel for the Collateral Agent and the Neugebauer Parties held a meeting with the Trustee and his counsel about the filing of the DEGA Complaints on May 10, 2024. At that meeting, the Trustee and his counsel expressed concerns about whether the filing of the DEGA Complaints would violate the automatic stay, which counsel for the Collateral Agent and the Neugebauer Parties admits. *See* ECF No. 104-50 at 2. Counsel for the Collateral Agent and the Neugebauer Parties also admits that the Trustee and his counsel

suggested that they should seek relief from the stay before filing the DEGA Complaints. *Id.* at 3. Accordingly, there is no question that both the Collateral Agent and the Neugebauer Parties knew about the existence of the stay, including as it pertained specifically to the DEGA Complaints.

34. Likewise, Mr. Neugebauer previously filed his own motion for violation of the automatic stay in the underlying bankruptcy proceeding approximately one year earlier and was awarded $103,997.97 in damages based upon similar facts. *See* Bankruptcy ECF No. 118.

35. Now the Court turns to whether the actions taken by the Collateral Agent and the Neugebauer Parties were willful and whether they, in fact, violated the stay. As to willfulness, case law applicable to Section 362 of the Bankruptcy Code makes clear that it is unnecessary to prove that the Collateral Agent and the Neugebauer Parties *intended* to violate the stay itself; instead, the statute only requires that the Collateral Agent and the Neugebauer Parties **intended to take the actions that allegedly violated the automatic stay**. *In re Wilson*, 610 B.R. 255, 276 (Bankr. N.D. Tex. 2019) (Morris, J.). As to whether these actions were violations of the automatic stay, such determination largely depends on whether the claims asserted in the DEGA Complaints constituted property of the estate or were at least arguably property of the estate. *See Chesnut*, 422 F.3d at 301.

36. This Court has repeatedly had occasion **in this proceeding** to forewarn parties that the Fifth Circuit's decision in *Chesnut* stands for a simple proposition in questioning whether the stay applies—"Ask for permission not forgiveness." *See* Bankruptcy ECF No. 118. In *Chesnut*, a creditor with knowledge of the stay foreclosed on real property that the debtor contended was part of the estate without first obtaining relief from the stay. 422 F.3d at 300. There was some dispute over whether the debtor had an interest in the real property,

with the debtor contending he held a community interest in the foreclosed property and the creditor contending that the property was the sole separate property of the debtor's wife. *Id.* The debtor brought an action against the creditor for violating the automatic stay, and the creditor contended that the creditor's belief that the real property was not part of the estate obviated the need to seek to lift the stay. *Id.* at 301. Without deciding whether the real property was property of the estate, the bankruptcy court held that the creditor violated the automatic stay. *Id.* The district court reversed, holding that the real property was the separate property of the debtor's wife and therefore there was no violation of the stay given the debtor and estate had no interest in the real property. *Id.* The Fifth Circuit first determined that the violation was willful. *Id.* at 302. The Court explained that it did not matter whether the party believed in good faith that it was not violating the automatic stay. *Id.* Rather, it only mattered that the party knew of the automatic stay and that the actions taken were intentional. *Id.* The Fifth Circuit also found that the creditor's actions violated the automatic stay. *Id.* at 304. The Fifth Circuit held that a violation occurs if a creditor seizes the property or takes an action against property that is **<u>arguably</u>** property of the estate. *Id.* The Fifth Circuit stated, "Where seized property is arguable property, it is no answer for the creditor to defend the foreclosure by claiming that the property was not covered by the stay." *Id.*

37. Here, as the Court previously found in the Memorandum Opinion, the causes of action asserted in the DEGA Complaints were primarily causes of action belonging to the estate. Even if the Collateral Agent can feign some argument that it thought that it had foreclosed on certain causes of action, it did **<u>not</u>** have a security interest in commercial tort claims. Its then-counsel admitted as such in open court at a hearing in May 2024.

38. The Collateral Agent and the Neugebauer Parties willfully filed the DEGA Complaints. Even if the Collateral Agent and the Neugebauer Parties had an "arguable" belief that they owned the causes of action asserted in the DEGA Complaints, *Chesnut* nonetheless instructs them to come to the Court for "permission" to proceed with the causes of action. Despite meeting with the Trustee **ahead** of filing the DEGA Complaints and being told by counsel to the Trustee about the necessity of seeking relief from the stay, the Collateral Agent and the Neugebauer Parties pushed forward and filed the DEGA Complaints. Neither the Collateral Agent nor the Neugebauer Parties ever requested the Court to lift the automatic stay as to the causes of action asserted in the DEGA Complaints. Again, the fact that Mr. Neugebauer (using the same counsel) previously brought a similar stay violation motion and was awarded judgment for damages speaks volumes of the willfulness of the violation. Further, Mr. Manning candidly testified that one of the reasons that the Collateral Agent filed the DEGA Complaints was to impact the Trustee's sale of the estate's causes of action. Bankruptcy ECF No. 361 at 41-42. Therefore, the Court easily concluded in the Memorandum Opinion that the filing of the DEGA Complaints constitutes a willful violation of the automatic stay by the Neugebauer Parties and the Collateral Agent. Moreover, given the Court's findings as to ownership of the various causes of action asserted in the DEGA Complaints, the causes of action at issue were not only **arguably** property of the estate, but they were also **actual** property of the estate in many cases. Accordingly, the Court finds, pursuant to Counts 20 and 21 of the Complaint, that the actions taken by the Collateral Agent and the Neugebauer Parties relative to filing of the DEGA Complaints to be in violation of the automatic stay imposed by Section 362(a)(3) of the Bankruptcy Code, entitling the Trustee to damages.

39. 11 U.S.C. §362(k)(1) provides, in pertinent part:

>   [A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

40. Congress's use of "shall" mandates the award of actual damages once a court finds a willful violation of the automatic stay.  *Garza v. CMM Enters., LLC (In re Garza)*, 605 B.R. 817, 829 (Bankr. S.D. Tex. 2019) ("Section 362(k)(1) mandates that one injured by a willful stay violation 'shall recover' actual damages, costs and attorneys' fees. . . . The words 'shall recover' indicate that Congress intended that the award of actual damages, costs, and attorneys' fees be mandatory upon a finding of a willful violation of the stay").

41. In the case of attorney's fees and costs, while § 362(k) does not expressly impose a requirement that such fees and costs be reasonable and necessary, courts have determined that such an award must be reasonable and necessary and that courts should scrutinize the fees by attorneys for unnecessary and excessive charges. *Wilson*, 610 B.R. at 278.

42. The Trustee is arguably an individual for purposes of § 362(k) in that the Trustee is a natural born person.  However, case law is split as to whether a trustee may recover under § 362(k). *See Havelock v. Taxel (In re Pace)*, 67 F.3d 187, 193 (9th Cir.1995) (holding that a trustee cannot recover under § 362(k) because it is the bankruptcy estate and not the trustee who is injured by a stay violation); *In re Morganstern*, 542 B.R. 650, 659 (Bankr. D. N.H. 2015) (holding that, because a trustee represents the bankruptcy estate, she is not herself an individual for purposes of § 362(k));  *In re Sayeh*, 445 B.R. 19, 27 (Bankr. D. Mass. 2011) (holding that a narrower definition of "individual" results in a better reading of § 362(k)); *but see Bohm v. Howard (In re Howard)*, 428 B.R. 335, 338 (Bankr. W.D. Pa. 2010) (applying broad definition of "individual" and permitting trustee to recover

under § 362(k)); *Moser v. Mullican (In re Mullican)*, 417 B.R. 389, 403–04 (Bankr. E.D. Tex. 2008) (same).

43. Nevertheless, the Defendants concede and the Court hereby finds that, even if the Trustee, as Plaintiff, does not constitute an individual pursuant to § 362(k), pursuant to § 105 of the Bankruptcy Code and this Court's contempt powers, the Court has the power to sanction a party for violations of § 362.  *See* ECF No. 159 at 3 (citing *In re Dyer*, 322 F.3d 1178, 1190 (9th Cir. 2003)); *Jove Engineering, Inc. v. I.R.S.*, 92 F.3d 1539, 1552 (11th Cir. 1996); *Pace*, 67 F.3d at 193 (holding that damages in the form of costs and attorney's fees that are not available to non-individual under § 362(h) are available under § 105(a) as a sanction for ordinary civil contempt.); *In re Chateaugay Corp.*, 920 F.2d 183, 186–87 (2d Cir.1990) ("For other debtors [who are not natural persons], contempt proceedings are the proper means of compensation and punishment for willful violations of the automatic stay."); *In re Skinner*, 917 F.2d 444, 447 (10th Cir. 1990) (holding that Section 105 provides civil contempt powers); *In re Walters*, 868 F.2d 665, 670 (4th Cir. 1989) (recognizing civil contempt power under § 105(a)).

44. Such damages are an appropriate measure of redress for the Defendants' actions. *Morganstern*, 542 B.R. at 659 ("The Court's finding that the Trustee may not avail herself of § 362(k) does not affect the Court's decision in a practical way. The Court may sanction [the defendant] for violating the automatic stay under § 105.").  As the Fifth Circuit noted in *Cleveland Imaging*, § 105 of the Bankruptcy Code gives bankruptcy courts the power to issue civil contempt, including sanctions orders for violation of the automatic stay "to compensate another party for the contemnor's violation." *Cleveland Imaging and Surg. Hosp.*, 26 F. 4th 285, 294 (5th Cir. 2022).

45. A bankruptcy court's civil contempt power derives from § 105(a), under which courts have the authority to "issue any order, including a civil contempt order, necessary or appropriate to carry out the provisions" of the Bankruptcy Code. *In re Terrebonne Fuel & Lube, Inc.,* 108 F.3d 609, 613 (5th Cir. 1997). The party seeking such an order must first establish "'(1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order.'" *In re Lothian Oil, Inc.,* 531 Fed. Appx. 428, 445 (5th Cir. 2013) (quoting *F.D.I.C. v. LeGrand,* 43 F.3d 163, 170 (5th Cir.1995)) (alterations omitted)). It is undisputed that the automatic stay was in effect, and thus the Defendants were required to abstain from filing any causes of action that were property of the Debtor's estate at the time of the bankruptcy filing and therefore subject to the Trustee's control.

46. The Defendants were previously found to be in contempt of the automatic stay imposed by § 362(a)(3), based upon clear and convincing evidence, and the Court finds that an award of actual damages in terms of fees and expenses paid in connection with the Adversary Proceeding is proper to cure for the Defendants' conduct given the monetary damage to the Debtor's estate.

47. The Defendants rely upon *Taggart v. Lorenzen* for the proposition that the proper standard for a violation of the automatic stay is different from *Chesnut*, which the Defendants allege is a "strict liability" standard.  ECF No. 159 at 4-6; *see* 587 U.S. 554, 561 (2019). Rather, the Defendants allege that the proper standard is an objective "fair ground of doubt" standard articulated in *Taggart.* 587 U.S. at 561.

48. As an initial matter, it should be noted that *Taggart* addresses a violation of a **discharge injunction** rather than a violation of the automatic stay. The Supreme Court specifically stated in *Taggart*:

> An automatic stay is entered at the outset of a bankruptcy proceeding. The statutory provision that addresses the remedies for violations of automatic stays says that "an individual injured by any willful violation" of an automatic stay "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1). This language, however, differs from the more general language in section 105(a). The purposes of automatic stays and discharge orders also differ: A stay aims to prevent damaging disruptions to the administration of a bankruptcy case in the short run, whereas a discharge is entered at the end of the case and seeks to bind creditors over a much longer period. These differences in language and purpose sufficiently undermine Taggart's proposal to warrant its rejection. (We note that the automatic stay provision uses the word "willful," a word the law typically does not associate with strict liability but "'whose construction is often dependent on the context in which it appears.'" . . . We need not, and do not, decide whether the word "willful" supports a standard akin to strict liability.)

*Taggart*, 587 U.S. at 564–65 (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007)).

49. The Court notes that the words "strict liability" do not appear in *Chesnut.* Rather, the focus is on the willfulness of unilateral seizure. *Chesnut,* 422 F.3d at 303. Because bankruptcy courts have "broad discretion to lift stays", the Fifth Circuit made clear that the Bankruptcy Code suggests a preference "for adjudication rather than seizure." *Id.* If a creditor wishes to exercise control over property, "he cannot do so first and thereby force the debtor to vindicate his rights after the seizure. Instead, he must first seek relief from the bankruptcy court." *Id.* As the Fifth Circuit aptly stated as applicable to the instant facts, "a retroactive classification of the property to shape the scope of the stay would encourage creditor abuse." *Id.* at 304. **It is this abuse of the process that the Court condemned in the Memorandum Opinion.**

20

50. Furthermore, even if the traditional civil contempt principles apply, the Court finds there was objectively no "fair ground of doubt" that: (1) the Defendants' conduct was intentional and wrongful; (2) the stay was in effect; (3) **this Court** had previously determined that *Chesnut* requires a party ask for permission rather than forgiveness as it pertains to taking action against arguable estate property (concerning which there was an **existing** appeal in an affiliated adversary proceeding involving the **same** parties); (4) the Collateral Agent did not have a security interest in commercial tort claims; (5) claim ownership was a complex issue; and, most importantly, (6) **the Trustee** took the affirmative position that the DEGA Complaints constituted a violation thereof prior to the filing of the DEGA Complaints.

51. Rather, the Court found that the Defendants **intended** to disrupt the Trustee's sales process by the filing of the DEGA Complaints (thereby violating the automatic stay) and did in fact do so, causing the Trustee, and therefore the estate, to incur substantial, additional legal fees to litigate claim ownership. *See Chesnut*, 422 F.3d at 306 ("[T]he potential effect on Mr. Chesnut and on other creditors was substantial. If the Eastland property is indeed property of the estate, it would constitute one of Mr. Chesnut's most substantial assets. By seizing it, Brown would seriously harm Mr. Chesnut's estate, as well as hinder the ability of other creditors to obtain equitable distributions of the estate's resources.") (citation omitted) (internal quotations omitted).

52. The onus was not on the Trustee to defend his position, as the Defendants asserted;  it was on the Defendants to ask for permission to file the DEGA Complaints in accordance with established Fifth Circuit law.

53. "A stay aims to prevent damaging disruptions to the administration of a bankruptcy case in the short run." *Taggart*, 587 U.S. at 565. The Defendants' action described at length in the Memorandum Opinion constituted damaging disruptions to the administration of the underlying bankruptcy case.

54. The Trustee requested $773,014.50 in attorney's fees, $17,457.02 in expert fees and $151,952.35 in expenses, for a total of $942,423.87, as actual damages for the Defendants' violation of the stay and violation of court orders. ECF No. 156-1. The Trustee sought an equal amount in punitive damages. *Id.*

55. The time included work performed by the Trustee's counsel from May 17, 2024 (the date the Trustee received a copy of the Georgia Complaint) to April 1, 2025.

56. The evidence reflected that amounts requested by the Trustee are net of approximately $85,000 in voluntary reductions to time and expenses.

57. The only objections to the damages themselves raised by the Collateral Agent and the Neugebauer Parties were segregation, inevitability and the fairly nonsensical argument that the ultimate sale of the causes of action led to proceeds coming into the estate and therefore the estate somehow "benefitted". The bulk of the Trustee's evidence was unchallenged on the whole. The Trustee incurred over $935,000 litigating **this Adversary Proceeding**. This Adversary Proceeding did not have to be brought by the Trustee were it not for the Defendants' violation of the automatic stay and calling into question the ownership of the causes of actions brought by the Defendants in the DEGA Complaints. The Trustee intended to sell a number of these causes of action at auction, and the Defendants purposely and thoroughly interfered with that process. This violation, whether a violation of the automatic stay or civil contempt for violation of Court orders, cost the

creditors of this estate real dollars in terms of litigation expenses. The fact that claims were sold after many months of litigation and over a million dollars in fees and expenses is not a "win" for the estate. **<u>Creditor distribution was hindered, and the estate was harmed.</u>**

58. As to segregation, the Defendants' arguments are overruled. Given that, under Texas law, attorney's fees are not recoverable "unless authorized by statute or contract," courts applying Texas law have generally required attorney's fee claimants to "segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310–11 (Tex. 2006). A plaintiff is "required to show that [attorney's] fees were incurred while suing the defendant sought to be charged with the fees on a claim which allows recovery of such fees." *Id.* at 311 (citations omitted) (internal quotations omitted).

59. In *Tony Gullo Motors*, the court was specifically tasked with handling attorney's fees in relation to a complaint that contained contract, tort, and DTPA causes of action, noting that, even where segregation of attorney's fees is required, the standard "does not require more precise proof for attorney's fees than for any other claims or expenses," and that "attorneys did not have to keep separate time records when they drafted the fraud, contract, or DTPA paragraphs of [the plaintiff's] petition." *Id*. at 314. Rather, as noted by the Fifth Circuit, "To meet a party's burden to segregate its attorney's fees, it is sufficient to submit to the fact-finder testimony from a party's attorney concerning the percentage of hours related to claims for which fees are not recoverable." *ATOM Instrument Corp. v. Petroleum Analyzer Co., L.P.*, 969 F.3d 210, 217 (5th Cir. 2020) (citation omitted) (internal quotations omitted).

60. Turning first to the reasonableness of the total amount requested by Trustee, it bears repeating there was no timely objection to the *reasonableness* of the time. Except as determined below, the Court finds the amount requested to be reasonable, based on the following factors:

(1) the time and labor required: The Court finds the time spent commensurate with the task performed;

(2) the novelty and difficulty of the questions: The Trustee was called upon to address complex issues crossing myriad defendants and multiple sets of opposing counsel in a short timeframe;

(3) the skill requisite to perform the legal service properly: Counsel was very skilled and adept to the tasks at hand;

(4) the preclusion of other employment by the attorney due to acceptance of the case: A law firm can only take on so many cases of this size, litigiousness and complexity at a time while representing Chapter 7 trustees, given the risk of payment;

(5) the customary fee: Fees were customary for the skill needed and the tasks performed in this district, if not below market;

(6) whether the fee is fixed or contingent: Fees were fixed at lower billable rates;

(7) time limitations imposed by the client or the circumstances: Counsel faced numerous time pressures given the number of Defendants, their myriad counsel and multiple pieces of litigation;

(8) the amount involved and the results obtained: Counsel was successful on the whole;

(9) the experience, reputation, and ability of the attorneys: The attorneys at Munsch Hardt are skilled, experienced and reputable;

(10) the "undesirability" of the case: Representation of the Trustee is not necessarily undesirable, but collection is often delayed and difficult;

(11) the nature and length of the professional relationship with the client: Munsch Hardt is a preferred counsel for the Trustee; and

(12) <u>awards in similar cases</u>: The fees were similar to those in the district and the award is on par with another award for violation of the stay in this bankruptcy proceeding in favor of Toby Neugebauer, a Defendant.

61. The Court disallows $6,601.50 of the time requested by the Trustee because, upon the Court's independent review of the time entries, the Court finds that the time relates to issues outside of the above-captioned adversary proceeding, namely fees relating to motions to convert or motions to compromise.

62. Except as provided below, the Court finds the expenses incurred by the Trustee, including, but not limited to, e-discovery, postage and mailing costs, UCC searches, copy services, travel expenses, courier services, transcription and deposition fees, and data hosting, to be reasonable in category and amount.

63. The Court will disallow $2,275.36 of data storage costs that pre-dated the DEGA Complaints.

64. As to segregation, the Court notes that counsel took great pains to only request fees and expenses for this Adversary Proceeding (except as noted above). However, the Defendants take issue with the fact that the Trustee did not separate the fees incurred in relation to unsuccessful causes of action and that the Trustee did not segregate by Defendant. Taking the issues in reverse order, counsel for the Trustee testified approximately $698,263.00 in fees and $143,284.52 in expenses were attributable Neugebauer Defendants, and the remainder was attributed to the Collateral Agent.

65. The principle underlying segregation of attorney's fees is that a claimant should reasonably distinguish its attorney's fees for recoverable and non-recoverable causes of action. Here, regardless of whether the Plaintiff provided for this distinction by the hour or by the total amount incurred, the Court reiterates that Munsch Hardt's were voluntarily

reduced by over $90,000 (through voluntary and Court-ordered reductions). Indeed, the objecting Defendants did not provide a reasonable alternative model for the Court to utilize in determining whether the Plaintiff has provided a reasonable segregation of the Trustee's fees.

66. Moreover, counsel for the Trustee credibly testified that the Trustee was forced to bring all of the cause of action in one adversary proceeding.  It was not possible to segregate counsel's time entries any further.

> [T]he predicate for a stay violation is that it's estate property. In order to prove the stay violation, it had to be estate property. In other cases, that's as simple as saying you've got a title or it's some other simple document. As far as we understand, the only way to meet the predicate that it's a stay violation is to show that the estate owns it. If it's causes of action, other than a [declaratory judgment] action, … I'm not really sure how you do that. And so the determination of the extent of the estate's property is you can't have a stay violation without it. It's part of the same claim. It all goes to the 362(k). We can't get there without proving up those other issues. And that's why you cannot segregate them.

ECF No. 173 at 76.

67. The Trustee feared that failure to bring the other causes of actions, like wrongful foreclosure against OnPoint, would result in res judicata. Indispensable claims against indispensable parties had to be brought together.

68. Likewise, the evidence showed that even the causes of action that the Trustee did not prevail upon were lesser portions of briefing and research (such as recharacterization and equitable subordination), and in many cases included elements that the Trustee did in fact prevail upon in other successful causes of action (such as recovery of insider preferences). Therefore, the work performed was not wasted.

69. The Defendants also objected to expenses for certain depositions that were used for this Adversary **and** other litigation. That objection is overruled because the Court utilized the evidence for **this Adversary**.

70. As to the inevitability defense—that the Trustee would have needed to litigate the causes of action in the Adversary in any event—the Court is unpersuaded. A trustee typically sells claims and causes of action "as is, where is", without warranty. Litigation over whether the Collateral Agent had a lien on certain causes of action was not inevitable. The evidence reflected that the Trustee could have a) sold those claims with a buyer being forced to determine who owned them, or b) abandoned any claims if the cost of litigation was too steep for the estate in his estimation. The filing of the DEGA Complaints (including the press that Mr. Neugebauer made sure the filing received) forced the Trustee's hand. Therefore, the Court finds that the scope and breadth of this Adversary Proceeding was in no way "inevitable".

71. Accordingly, as damages for violation of the automatic stay and willful disregard of Court orders, the Court awards damages to the Trustee in the amount of **$933,547.01, with $99,889.53 against the Collateral Agent and $833,657.48 against the Neugebauer Parties (who are jointly and severally liable amongst each other)** (collectively, the "**Damages Award**").

72. The Court declines to impose punitive damages at this time.

73. However, should the judgment in favor of the Trustee resulting from the Memorandum Opinion and from these Finding of Fact and Conclusions of Law (including the Damages Award) be appealed, $150,000.00 shall be added to the judgment for the Trustee's attorney's fees relative to an appeal to the District Court and an additional $150,000 for

the Trustee's attorney's fees relative to an appeal to the Fifth Circuit Court of Appeals.

These amounts shall be in addition to post-judgment interest at the federal judgment rate

if the judgment is not paid within 14 days after entry of the judgment.

The Trustee and OnPoint are hereby directed to upload forms of Final Judgment consistent with

the Memorandum Opinion and these Findings of Fact and Conclusions of Law as to the Damages

Trial.

### ###END OF ORDER###